UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | |
|---|---|
| Prepared Food Photos, Inc., | No. 3:22-cv-37-TAD-KDM |
| *plaintiff,* | Judge Terry A. Doughty |
| versus | Magistrate Judge Kayla D. McClusky |
| Epic Solutions, LLC, ET AL., | **Jury Trial Demanded** |
| *defendants.* | |

### DECLARATION AND CERTIFICATION OF SHANE WAX, ESQ.,

I, Shane Wax, declare and certify as follows:

1.      I am an associate at Leichtman Law PLLC, attorneys for Plaintiff Prepared Food Photos, Inc., ("Plaintiff" or "PFP") in the above captioned action. I submit this declaration in support of Plaintiff's Motion for Sanctions against Defendant Adrien's Supermarket, Inc. ("Adrien's"), McDaniel Food Management, Inc., McLawrence Foods, L.L.C., McDaniel Foods of Alexandria, Inc., McDaniel Foods of Drew, LLC, McLawrence Foods of Swartz, Inc., McLawrence Foods of Oak Grove, Inc., McLawrence Foods of Columbia, LLC, McLawrence Foods of W. Monroe, LLC, (collectively, the "Mac Defendants"), Piggly Wiggly South Opelousas, LLC, ("Piggly Wiggly"), and Sullivan's Grocery LA#2 Inc., Sullivan's Inc Grocery, ("the Sullivan Defendants"), (collectively, the "Grocer Defendants"), and Epic Solutions, LLC, ("Epic") (collectively, with the Grocer Defendants, the "Defendants"), submitted herewith (the "Motion").

2.      The purpose of this Declaration is to provide a timeline of events, including each misrepresentation made by and each delay caused by Defendants and/or Defendants' counsel, Leake & Andersson, L.L.P.  This declaration is based on my personal knowledge, my review of the pertinent facts of this case, and my discussions with Andrew Lilly, David Leichtman, and Alexander Katz, who are all attorneys of record for Plaintiff.  Reference is

1

made herein to the February 22, 2023, Declaration and Certification of Alexander Katz, Esq., Pursuant to Local Rule 37.1, R. Doc. 62-1 (the "February Katz Decl."), and Exhibits A-F thereto (the "February Katz Exs."); the March 22, 2023 Reply Declaration of Alexander Katz, Esq., R. Doc. 75-1 (the "March Katz Decl."), and Exhibits G-N thereto (the "March Katz Exs."); the April 4, 2023 Declaration of Alexander Katz, Esq., R. Doc. 80-2 (the "April Katz Decl."); and the April 4, 2023 Declaration of Andrew Lilly, Esq., R. Doc. 8-03 (the "Lily Decl."), all of which are hereby incorporated by reference.

3. Defendants' discovery deficiencies in this action began early and have now persisted for nearly one year due to the refusals of each Defendant and/or their counsel to produce documents and information responsive to Plaintiff's discovery requests and, now, refusals to comply with the June 7, 2023 Court Order, which was memorialized by the court reporter in a Hearing Transcript, (the "Transcript"), which was thereafter provided to all Parties. Relevant excerpts from the Transcript are attached hereto as **Exhibit A**.[1] As set forth with specificity below, more than two months have passed since the Hearing, but the Defendants have hardly produced any of the documents or information that they were Ordered by Magistrate Judge McClusky to produce more than 30 days ago.

4. Plaintiff served its first sets of requests for documents to each of the Defendants, nearly a full year ago, in August of 2022. The cover e-mail sent by Plaintiff's Counsel containing Plaintiff's first set of discovery requests is attached hereto as **Exhibit B**. Defendants served written responses in September 2022, followed by a miniscule production of heavily redacted documents by Adrien's, Piggly Wiggly, and Epic only in October. *See* February Katz Decl. ¶¶ 4-9.

5. Defendants' discovery deficiencies were raised by Plaintiff's counsel in a letter dated October 10, 2022. *See Id.* ¶ 10; February Katz Ex. D. An initial meet and confer was held on October 25, but did not yield any new document productions from Defendants as they had

---

[1] The excerpted Transcript attached as Exhibit A is annotated to denote the Court Orders primarily directed to Plaintiff (green highlighting) and those Orders primarily directed to the Defendants (yellow highlighting).

2

promised, and so a second meet and confer was held on November 28th. *See* February Katz Decl. ¶¶ 11-14. During both meet and confers, Defendants' counsel made representations to Plaintiff's counsel that Defendants would be producing additional documents by dates certain, but then failed to live up to those promises, and thereafter falsely claimed to have never made those promises to begin with. *See e.g., Id.* ¶ 15 ("Defendants' counsel replied by e-mail, also on December 23, 2022 . . . stating that she did 'not recall any such firm agreement to provide any additional documents by a certain date.'"); Exhibit A to Defendants' Opposition to Plaintiff's Motion to Compel, R. Doc. 72-1 (e-mail from Karen Futch sent January 5, 2023, noting "the miscommunication with regard [to] the firm January 6th deadline").

6. On January 4, 2023, Plaintiff's counsel attempted to schedule a third meet and confer, but was rebuffed by Defendants' counsel who refused to make herself available for a whole week. *See Id.*; February Katz Decl. ¶ 17. Nevertheless, on January 9, 2023, Defendants' counsel made another promise to produce documents, this time by January 23rd, though, once again, Defendants did not produce many documents. *See Id.* ¶ 18. None of the Grocer Defendants produced any new documents on or before January 23, 2023, and Epic's second production of documents on that date merely consisted of 100 pages, "consist[ing] of some draft advertisements and proofing sheets plus 12 pages of invoices between Epic and the Grocer Defendants, albeit only for 2021-2022 and with all financial amounts redacted." *Id.* ¶ 18; *See* February Katz Ex. C-3.

7. Thereafter, Plaintiff's Counsel and Defendants' Counsel exchanged several e-mails about the form of Epic's January 23rd production, namely (a) the impropriety of redactions, and (b) the incomplete nature, particularly as Epic did not produce documents prior to 2021. *See* February Katz Decl. ¶ 22-25; February Katz Ex. E.

8. On February 10, 2023, Plaintiff's Counsel received an e-mail from Defendants' Counsel, a copy of which was previously filed with the Court by Defendant as Exhibit G to Defendants' Opposition to Plaintiff's Motion to Compel [R. Doc. 72-7], which is reproduced

3

and attached hereto as **Exhibit C**, containing various excuses for Defendants' discovery failures up to that point in time, including that:

> *[T]he delay in production is not due to any unwillingness on my client's part, but due to the small size of their company and ability to divert employees for this task. They are making their best efforts to provide documents to our office for review and eventual production. . . .*
>
> *Due to the very large volume of documents needed to review by my office before they can be produced, which we received this week, coupled with the mardi gras parade season requiring remote work, we are reviewing the documents as quickly as reasonably possible. . . .*
>
> *We decline to provide unredacted copies of the insurance policies, as we do not believe the redacted information is relevant or reasonably calculated to lead to the discovery of admissible evidence.*

*See* Exhibit B; February Katz Decl. ¶ 25. Thus, Defendants' Counsel admitted to making unilateral choices to redact materials for no lawful purpose, namely to protect sensitive or privileged information, but instead for the improper purpose of gatekeeping discoverable information and keeping unprotected information out of the hands of Plaintiff.

9. Plaintiff's Counsel responded by e-mail the same day, February 10th, noting that unilateral redactions are not permitted, that Defendants' Counsel did not address the fact that no documents prior to 2021 had been produced, and further that the "mardi gras season is a feeble excuse considering how long your client has had our requests. There were no parades happening in early December."

10. On February 17, 2023, Adrien's and Piggly Wiggly's each made a second production of documents, which were incomplete and miniscule in number of pages, particularly as these Grocers did not produce any documents prior to December 2020. *See* February Katz Decl. ¶¶ 27, 28.

11. Plaintiff's Motion to Compel [R. Doc. 62] was filed on February 22, 2023, and submitted on March 23, 2023.

4

12. In response to Plaintiff's Motion to Compel, rather than simply producing their outstanding documents, the Grocer Defendants instead filed their own Motion to Compel [R. Doc. 69], though Epic did not join that motion (the "Grocers' Motion to Compel"). The Grocers' Motion to Compel was submitted on April 11, 2023.

13. In connection with Plaintiff's Motion to Compel and the Grocers' Motion to Compel, and given the volume of requests at issue in addition to Defendants' attempt to obfuscate the issues and mislead the Court as to discovery, the Court scheduled a hearing on the parties' competing motions, which took place via video conference on June 7, 2023 (the "Hearing").

14. Just days before the Hearing, on June 2nd, the Mac Defendants and Sullivan Defendants made their first production of documents, under Bates Nos. MAC 000141 – 002812 and SULLIVANS 000118 - 001342, respectively. These documents consisted only of grocery advertisements and mock-ups since approximately the beginning of 2021, even though Defendants' infringing activities date back to 2019 and Plaintiff has repeatedly requested advertisements dating back to 2014. Moreover, the advertisements belatedly produced by the Sullivan Defendants contained redactions of public information, namely the names and addresses of locations of Sullivan stores located outside of Louisiana. Then, on June 6th, the day before the Hearing, the Grocer Defendants made a further production consisting of: (i) redacted copies of Adrien's insurance policies, for 2020-21 and 2021-2022 only, under Bates Nos. ADRIENS 003908 – 004191; and (ii) redacted copies of Piggly Wiggly's insurance policies, again for 2020-21 and 2021-2022 only, under Bates Nos. PIGGLY WIGGLY 000575 - 001027.[2] No explanation was provided for redacting the Grocer Defendants' documents, particularly as none of the Grocer Defendants is a business competitor with Plaintiff as PFP is not in the business of selling produce, food or related goods, nor has any explanation been

---

[2] Additionally, on June 6th, the Mac Defendants and Sullivan's re-produced Bates stamped and redacted insurance policies for the same years, 2020-21 and 2021-22. None of the Groer Defendants have produced unredacted insurance policies for these two years, nor any earlier insurance policies, such as for 2019-2020.

provided for why none of the Grocer Defendants have failed to produce any documents from before 2020.

15. During the June 7th Hearing, Judge McClusky Ordered the Plaintiff, Epic and the Grocer Defendants to produce certain documents and information under their respective possession, custody or control (the "Order"). The Court's Order was in the Transcript. *See* **Exhibit A**.

16. Specifically, the Court ordered the Defendants to produce the following:

   i. "I am ordering that Epic do produce responsive photos that they have physically at their facility, and I'm ordering at this point to provide copies to PFP of what they have…I am going to give you guys one month to produce that. . . . Epic is to produce the physical copies of the picture that they can locate within 30 days." (Transcript, at 19:12-20:12, 26:08-09);

   ii. "[W]hat I understood from Ms. Futch is her clients have done a search. They don't have anything that had the copyright management information on it. . . . I would expect . . . a response to the interrogatory saying exactly what you said [that "there was no identifying information, identifying these as Prepared Foods or any copyright management information altogether"]. . . . so to the extent the interrogatories need to be supplemented to make that clear, then that's what I would also expect in the next 30 days or next month" (Transcript, 20:17-19, 21:06-11);

   iii. "[D]uring that same 30-day period . . . obtain an affidavit from someone at Epic who is doing the search, what it is they are searching for, what they understand the parameters to be so that Mr. Wax can then reasonably understand what it is, the search they have done. . . I'm asking Ms. Futch to obtain an affidavit on is what their understanding of the copyright management information is, what search they did, how they came to the determination they didn't have anything responsive to [Plaintiff's] request. . . . provide an affidavit from the appropriate person for defendants who did the search and can explain what he or she did to attempt to locate the copyright management information." (Transcript, 24:12-19, 25:11-14, 26:10-12);

   iv. "[T]o the extent that there are email communications, not subject to some privilege, and of course, if they are subject to some privilege, you would need to provide a log on that, but if there are communications relevant to the subject of this lawsuit and subject of a discovery request by PFP . . . what I need is an affidavit provided to PFP that addresses what you guys have done, where you've searched, et cetera, and if there is anything responsive, because certainly I do think those kinds of email communications would be responsive and relevant to the lawsuit . . . any kind of communications via text or email, or I don't know what else it would be, but text or email." (Transcript, at 25:15-20, 26:13-30:04);

v. "[W]hat I need from Epic, Ms. Futch, is if they can identify where they would have gotten the remaining -- the small percentage of photos that you mentioned, who the other source was for those from the time period March 1, 2017, to December 31st of 2022. . . . Identify any other sources for those photos, and characterize for -- I say characterize -- provide to Mr. Wax, you know, what you've indicated is a very small percentage. If they know for sure that it was three photos, identify what those three photos were, then provide that information to Mr. Wax." (Transcript, at 43:19-44:05);

vi. "THE COURT: Ms. Futch, do you have --are the photos that Epic has, are they in a searchable way? When they search them, how did they search that? Is there a searchable -- is there a way to search the photos? . . . what I need is the affidavit from their person telling us what they did, how they did it, and if they can't do anything more, I need to know why they can't do anything more. So what I want to see is an affidavit prepared by someone who can explain what they did and what they can do and what they can't do both on the CMI and the photos generally, everything that we've talked about here today." Is that clear enough, Ms. Futch, that you know what to tell you your person for Epic?

MS. FUTCH: I believe so, yes." (Transcript, at 48:21- 49:08, 51:02-15);

vii. "So the four named grocers, I am ordering that they produce the advertising materials to the extent they have them, going forward to the December 31st of 2022. . . . what I'm understanding is they have made productions of some of the advertisements. You may need to do a supplemental production through December 31st of 2022 . . . I want produced advertisements for the four grocers from March 1, 2017 through December 31, 2022. If they don't have them, then I want that information conveyed to Mr. Wax in a discovery response. I don't know that that has to be an affidavit, but in a discovery response to Mr. Wax. . . . I'm going to order it as to any that fall under that corporate umbrella, if they are covered under that corporate umbrella. . .  So verify that the specific entities named in this lawsuit, if those include stores in Mississippi, Alabama, Arkansas, then certainly that would need to be produced as well. If the defendants who are named in this lawsuit are specifically Louisiana entities, as some of the -- the Macs Fresh Market that I was naming off, I recognize those names because I'm from here, as all being Louisiana entities. If some of those incorporations including locations in Alabama, Mississippi, Arkansas, wherever, then those would need to be included as well." (Transcript, at 52:17-20, 53:15-19, 54:23-55:15);

viii. "I'm going to order, that -- here's what I want to know. I want to know what that, you know, how many clients there are, what that number -- how would they be able to obtain that information and provide that information, and I understand what their concern is, but they are a named defendant in this lawsuit and they are alleged to have infringed by providing those advertisements." (Transcript, at 57:15-21);

ix. "I want to come back to the request for information on the defendants' sales revenue and profits since 2017 . . . I do think plaintiffs are entitled to do a damages calculation, and I don't know how they can do a

7

> damages calculation without information from the defendants. . . I do think [Defendants] are going to have to produce information so that plaintiffs can calculate their damages. . . . two weeks from today, I want . . . either a joint protective order or your separately proposed protective orders . . . and I will look at them both, and I will pick one, and then I will order that the information be produced subject to that protective order." (Transcript, at 59:22-60:03, 61:19-62:05).

17. The Court Ordered Plaintiff to produce, within 30 days: (1) amended or supplemental discovery responses which (a) includes "a statement either you have – you have produced all responsive documents, or there are no responsive documents," and (b) "mak[es] clear if there are attorney-client privileges responsive to any discovery request (Transcript, at 62:23–63:04, 77:24–78:22); (2) to produce any outstanding responsive and non-privileged documents (Transcript, at 66:16–18); and (3) "an affidavit or declaration that these are the 21 photos that were provided to the copyright -- they are identical to the ones provided to the copyright office" (Transcript, at 81:07–11, 82:12–25); and further to produce a privilege log within 45 days of the Hearing date (Transcript, at 77:22–79:01).

18. Additionally, the Court directed the Parties "go back and look at the protective order," [R. Doc. 50], and "two weeks from today, I want you to either have reached some agreement on a protective order that would adequately address your clients' concerns, Ms. Futch, on the concerns about providing financial information to a competitor, or if you guys cannot reach agreement . . . within two weeks, either a joint protective order or your separately proposed protective orders can be filed with the Court, and I will look at them both, and I will pick one." (Transcript, at 59:17-62:05). Thus, the Court Ordered the Parties to submit one or more proposed Protective Orders on or before June 21, 2023.

19. The day after the Hearing, on June 8th, the undersigned e-mailed Defendants' Counsel to set up a meeting to discuss, *inter alia*, potential solutions to reducing the discovery burdens on both parties. A telephonic meeting was held on June 12, 2023, during which time, counsel for the parties discussed various topics relating to discovery, including that Defendants' Counsel would provide any proposed changes to then-existing Protective Order [R. Doc. 50] by the end of the week, so that Plaintiff's Counsel would have time to review the

8

proposed changes, and either accept them or make a counter-proposal in advance of the June 20th deadline.

20. By Friday June 16, 2023, however, Defendants' Counsel still had not provided her proposed changes. The undersigned e-mailed Ms. Futch on June 16th noting this failure, and requesting Defendants' proposal no later than Monday.

21. On Monday afternoon of June 19th, two days before the Parties' deadline to submit one or two proposed protective orders, (*See* Transcript, at 59:17-62:05), Defendants' Counsel responded by e-mail stating that she did "not recall any specific agreement that our office would first be submitting a draft supplement to the protective order for your review." Plaintiff's Counsel thus reminded Ms. Futch about the telephone discussion held on June 12th, and the fact that Plaintiff was fine relying on the previous Protective Order, but it was Defendants who insisted on revising it. Indeed, the Court specifically addressed Defendants' Counsel, noting that the Court wanted the Parties to reach "some agreement on a protective order that would adequately address your clients' concerns, Ms. Futch, on the concerns about providing financial information to a competitor." (*Id.*, at 59:20-22).

22. At 6:08pm (CT) on June 20th, the night before the Parties' joint deadline, Defendants' Counsel finally circulated Defendants' proposed protective order, which was not a red-line edit of the existing Protective Order, but an entirely new Protective Order, which was substantially different in both form and substance, and could not fairly be reviewed, revised or commented upon by Plaintiff's Counsel in only a couple of hours.

23. Therefore, the following morning, Plaintiff's counsel tried calling and e-mailing Defendants' counsel to discuss her proposed protective order and the many formatting and substantive edits. Defendants' counsel eventually responded via e-mail that it did not have a red line edit, or similar comparison document to allow Plaintiff's counsel to review Defendants' proposed revisions by the filing deadline that evening. In view of Defendants' counsel's response and the pending deadline, Plaintiff instead sent Defendants' a red line draft revision of the previously entered Protective Order to allow for "Attorney's Eyes Only"

9

designations.  Ironically, Ms. Futch responded at 4:39pm (CT) on June 21st that she "will not have sufficient time to review this to be filed today." Defendants' counsel then asked Plaintiff's counsel, who is located in New York, and operating one hour ahead, to ask the Court for an extension of time "as I am no longer at the office and cannot do so tonight, given the lateness of this exchange," even though the "lateness of this exchange" was due to Defendants' Counsel's own lack of cooperation and communication.  Copies of this e-mail exchange are attached hereto as **Exhibit D**.

24. It is simply incredible that Defendants' Counsel is unable to review documents, correspond with Plaintiff's Counsel, or otherwise tend to her obligations in this litigation on account of the fact that she is not in her office.  Indeed, back in February, Defendants' Counsel explicitly informed Plaintiff's Counsel that she was working remotely from home due to the Mardi Gras parades. *See* Exhibit B.

25. Ultimately, the Parties requested, and the Court granted, an extension of time until June 26th to file their separate proposed protective orders [R. Doc. 88].  Notably, Defendants did not file the protective order that they had proposed by e-mail on June 20th, but instead filed a different proposal that was never shared with Plaintiff.

26. On June 29th, having reviewed the respective proposals, the Court adopted and endorsed the Protective Order drafted and proposed by Defendants' Counsel, with the caveat that "if counsel for either party determines that it is necessary to share information designated as C-AEO with an employee of the receiving company, then it may seek leave to do so via the appropriate motion." [R. Doc. 92; *see also* R. Docs. 90, 91 & 93].

27. Defendants' counsel requested a copy of the Transcript on June 14th, but due to circumstances beyond the parties' control, the Transcript was not obtained until July 13, 2023. Furthermore, according to a July 12th email from Defendants' Counsel: "Epic has been without power for over a week due to some storms which came through their area. While we are working to gather information, that has understandably delayed their progress as well."

28.     Therefore, Plaintiff's Counsel and Defendants' Counsel agreed to a mutual extension of time to serve the materials Ordered to be produced by July 7th, in order to allow for receipt and review of the Transcript and to ensure that each side was fully compliant with Court Orders. Specifically, the Parties stipulated that any materials Ordered to be produced within 30 days of the hearing (by July 7th) should be produced on or before July 20th (a 2-week extension), and that Plaintiff's deadline to produce privilege log would be extended to July 27th (a 1-week extension).

29.     Meanwhile, in the interim, Plaintiff continued to work diligently to obtain and prepare the materials to be produced pursuant to the Court's June 7th Order.

30.     On July 20th, Plaintiff was ready, willing, and able to produce all materials that it was originally Ordered to produce by July 7th. Thus, on July 20th, Plaintiff's counsel sent an e-mail to Defendant's counsel stating:

> Please confirm that you will produce documents and information, pursuant to Judge McClusky's June 7th Order, by end of day today.
>
> To ensure mutual compliance, Plaintiff would like the Parties to exchange documents simultaneously. Please let us know a specific time in which you intend to complete your production today, and Plaintiff will exchange its documents at that time.

31.     That day, at 4:52 PM (CT), Defendants' Counsel responded that she was "unexpectedly delayed out of town," due to a scheduled deposition, and therefore, would be unable to meet the agreed upon July 20th deadline. Moreover, Defendants' Counsel candidly admitted that she "scheduled a call with my clients in the morning with the hope that we can provide the required affidavit tomorrow." Based on these excuses, Defendants' Counsel requested another extension of time to meet their obligation. A copy of this e-mail exchange is attached hereto as **Exhibit E**.

32.     Again, Defendants' Counsels' excuses are incredible as the deposition was surely docketed on Defendants' Counsel's calendar well in advance, and Defendants' Counsel should

have already communicated with its clients and procured their documents and affidavits, instead of waiting 45 days after the Hearing to do so in the first place.

33. Considering the amount of time that had passed since the So-Ordered deadlines to produce, and the already agreed upon extensions of time thereto, Plaintiff's counsel was hesitant to allow an additional extension. Nevertheless, Plaintiff's Counsel conditionally consented to the requested extension. Specifically, Plaintiff stated:

> We will agree to grant your office an extension until next Friday to serve any **new** documents (which have not previously been served) provided that you produce all documents previously served (in redacted form) without the redactions tomorrow, as those documents have been in your possession for some time. Further, we expect to complete a mutual exchange of affidavits tomorrow, but in any case, by no later than Monday.

*See* Exhibit D. The reason for Plaintiff's request was simple: Defendants' Counsel was already in possession of numerous documents that were produced by Defendants before the Hearing, albeit with redactions implemented by Defendants' Counsel to material that Ms. Futch unilaterally deemed irrelevant or confidential, and a new Protective Order had been entered authorizing Defendants' to mark any documents as "Confidential – Attorneys' Eyes Only." That is, Ms. Futch did not need any additional information or documents from her clients in order to fully disclose previously produced documents without redactions.

34. Defendants' counsel ignored this email, and Plaintiff did not hear from Defendants again until the afternoon of July 21st, after Plaintiff's counsel again reached out to confirm that Defendants would comply with the express terms of Plaintiff's conditional agreement to extend Defendants' discovery deadlines. Unsurprisingly, Defendant's Counsel responded that she would be unable to complete the production, as her office systems were "down," and again refused to acknowledge the conditions set forth in Plaintiff's July 20th e-mail. Moreover, Defendants' Counsel did not produce any affidavits despite advising previously that she would "provide the required affidavit" by Friday July 21st.

35. On July 21st, putting Defendants' ability and willingness to comply with Court Orders aside, Plaintiff produced the amended discovery responses and client affidavit that Plaintiff was Ordered to produce. *See* Exhibit A (Transcript, at 62:23–63:04, 66:16–18, 77:24–78:22, 81:07–11, 82:12–25). No additional documents were produced because, as stated in the newly produced affidavit, Plaintiff had already produced all non-privileged documents understood to be responsive to the Grocer Defendants' demands.

36. On Monday, July 24th, Plaintiff's Counsel and Defendants' Counsel conducted a meet and confer to discuss privilege logs in addition to Defendants' outstanding discovery deficiencies in violation of the June 7th Court Orders. During this call, Defendants' counsel provided a plethora of excuses as to why she was unable to produce even a single document in compliance with the Court's Order, including that her clients were difficult to reach, and that her office systems were "down" that day. However, when pressed as to whether, if counsel's office systems were to immediately come back online, Defendants could produce, or had in their possession, a finalized copy of **ANY** documents or information mandated to be produced by the Court's June 7th Order, Defendants' counsel tacitly admitted that she had "**nothing**" to give to Plaintiff and that she was still drafting her clients' affidavits and responses. To reiterate, Defendants did not have <u>one single document</u> that they would be able to produce as of July 24th pursuant to Court Orders.

37. Further, on this call, Defendants counsel stated that none of the Defendants would be producing a Privilege Log as, in her view, Defendants were not withholding any documents or information based on any assertion of privilege.

38. Subsequently, on July 27, 2023, Plaintiff produced its Privilege Log to Defendants, thus fully completing Plaintiff's Court Ordered discovery obligations.

39. On July 28th, Defendants made their first production since the Court's June 7th Order. However, unsurprisingly, this production was incredibly deficient and not made in compliance with the Court's Orders. Specifically, this production included *only*:

13

    i.    Unredacted copies of advertisements from the Sullivan Defendants, under Bates Nos. SULLIVANS 000118 - 001342, previously produced to Plaintiff in redacted form on June 2, 2023, under the same Bates Range, for the same period, April 2021 – December 2022;

    ii.    A single page document entitled "Adriens Supermarket, Inc. Profit & Loss March 2017 through December 2022," produced under Bates No. ADRIEN's 004192, which is almost entirely redacted despite being marked as "Confidential – Attorneys' Eyes Only";

    iii.    A similar three-page document, entitled "Piggly Wiggly South Profit & Loss March 2017 through December 2022, produced under Bates No. PIGGLY WIGGLY 001028 - 001030, which is almost entirely redacted despite being marked as "Confidential – Attorneys' Eyes Only."

Copies of the redated documents produced by Adrien's and Piggly Wiggly on July 28th are attached hereto as **Exhibit F**, together with a motion for leave to file these documents under seal since they are marked "Confidential – Attorneys' Eyes Only."

40.    Defendants' Counsel has not provided any explanation for these redactions, let alone any reason why the "Attorneys' Eyes Only" designation is insufficient to protect her client's privacy interests. Likewise, Defendants' Counsel has not provided any explanation for her continued refusal to produce unredacted copies of Defendants' insurance policies, which, according to her February 10, 2023 e-mail, were not being withheld due to confidentiality, but under relevance grounds. (*See* Exhibit B).

41.    Finally, on August 14, 2023 -- over a month since the Court's deadline for production – nearly a month after the parties stipulated extension, and even weeks after the July 28th extension that Defendants unilaterally gave themselves -- Defendants made an additional production containing only a small portion the materials Defendants were Ordered to produce. This production consisted of an affidavit from Rick Malone, V.P. of Technology for Epic, (the "Malone Aff."), and approximately 106

pages of documents Bates numbered as Epic Solutions 417 – Epic Solutions 523. The Malone Affidavit is attached hereto as **Exhibit G**.

42. The Malone Affidavit does not contain all of the information Ordered to be produced by Epic, let alone any of the Grocer Defendants, and is ripe with matters outside of Mr. Malone's personal knowledge including legal assumptions and speculation. Additionally, the vast majority of the documents attached to the Malone Affidavit, Bates No. Epic Solutions 417 – Epic Solutions 523, are not responsive to Plaintiff's requests or the Court's Order, but which are merely provided to explain Mr. Malone's misguided and limited understanding of what constitutes CMI.

43. Pursuant to the June 7th Order, Epic was Ordered to produce an affidavit setting forth:

   i. "[W]hat it is they are searching for [in Plaintiff's photographs], what they understand the parameters to be so . . . what their understanding of the copyright management information is, what search they did, how they came to the determination they didn't have anything responsive to [Plaintiff's] request";[3]

   ii. Information about where Epic "would have gotten the remaining -- the small percentage of photos that you mentioned, who the other source was for those from the time period March 1, 2017, to December 31st of 2022," including by identifying the number of photos obtained from a third-party source and identifying the source for each such photo;[4] and

   iii. Information about how many clients Epic has and where they are there are located, particularly to the extent that Epic has provided Plaintiff's

---

[3] *Id.* (at 24:12-19, 25:11-14, 26:10-12).

[4] *Id.* (at 43:19-44:05).

15

photographs to any of its clients which are not named as the Grocer Defendants;[5]

44. The Malone Affidavit only attempts to provide information related to one of these three items – Defendant's understanding of and search for "copyright management information" or "CMI." The Malone Affidavit does not identify the third parties from which Epic sourced its photographs, the number of photographs obtained by Epic from each source, or which photographs it obtained from each source. Further, the Malone Affidavit states that Epic "currently has 19 clients" (Malone Aff. ¶4), but it does not identify how many clients Epic had at other points in time since March 1, 2019, does not identify any of Epic's clients by name or state where they are located, and does not state how many of Epic's clients were provided advertisements that use Plaintiff's photographs.

45. Additionally, the Malone Affidavit reveals that Defendants have impermissibly restricted their understanding of CMI to only include "metadata." CMI also includes, *inter alia*, the "name of, and other identifying information about, the author of a work," and/or about "the copyright owner of the work, including information set forth in a notice of copyright," that is "conveyed in connection with copies or phonorecords of a work or performances or displays of a work." 17 U.S.C. § 1202(c). This would include, for example, any authorship or ownership information conveyed on a disc or drive, whether as readable data or on the face of the physical disc, or including in terms and conditions conveyed in connection with the work. Moreover, the Malone Affidavit does not identify what metadata or other CMI was conveyed by Epic to its customers, and none of the Grocer Defendants have produced an affidavit identify what metadata or CMI, if any, they received from Epic.

---

[5] *Wax Ex. A* (Transcript, at 57:15-21).

46. Additionally, the Malone Affidavit specifically identifies documents and information relevant to Plaintiff's requests, and required to be produced under Court's order, that Defendants now admit that they have destroyed or otherwise failed to preserve. Specifically, Epic admits destroying nearly every single responsive document from before 2021, despite being explicitly notified that it should "reasonably anticipate litigation" in July 2020, including but not limited to advertising proofs, printed circulars, communications with clients, and photographs in its library for which Epic could not definitely identify the source (Malone Aff., at ¶¶ 26, 29, 30, 32).

47. Further, the Malone Affidavit specifically identifies documents which are currently in Epic's possession, but which have not been produced despite being responsive to Plaintiff's requests and subject to Court Order. Specifically, Epic's library supposedly includes images that are "similar but not a match" to Plaintiff's Photographs (Malone Aff., at ¶ 15). Epic has not produced these "similar" photographs, even though copyright infringement is not limited to verbatim copying.

48. The Malone Affidavit claims that "Epic encourages all of [its] customers to restrict all communications concerning their ads, to [Epic's] proofing system" and that Epic "does not communicate with customers regarding the selection of photographs used in the advertisements created by Epic Solutions via text message." (Malone Aff., at ¶¶ 30-31). This is belied by Epic's own documents which evidence that communications *were* transmitted via text, email or otherwise outside of the proofing system. Attached as **Exhibit H** are copies of communications produced by Defendants, evidencing communications occurring outside of Epic's Proofing System, some of which were displayed or quoted by Plaintiff's counsel during the June 7th Hearing. *See, e.g.*, Exhibit A (Transcript at 21:17-21) ("I showed you one just a few minutes ago from Adriens . . . I can show you the screen again, the one I showed is Adriens telling Epic, 'use the photo I texted you.'"); *Id.* (at 29:24-30:01) ("Some of the

17

documents we've received from the defendants so far say . . . 'use the photo I texted you.'").

49. Attached to the Malone Affidavit were 7 sets of documents totaling 106 pages, but the majority of those documents are not actually responsive to Plaintiff's requests. Many of these documents are purportedly offered to help explain Epic's understanding of and search efforts for CMI, including:

   i. The meta data information for copies of Plaintiff's photographs used by Epic for the Mac Defendants, produced at Bates Nos. Epic Solutions 417 – 451;

   ii. The meta data information for copies of Plaintiff's photographs used by Epic for Adrien's, produced at Bates Nos. Epic Solutions 452 - 496;

   iii. The meta data information for copies of Plaintiff's photographs used by Epic for Piggly Wiggly, produced at Bates Nos. 497 - 501;

   iv. The meta data information for copies of Plaintiff's photographs used by Epic for the Sullivan Defendants, produced at Bates Nos. Epic Solutions 502 – 506;

   v. A sample of several images sent by Plaintiff's former counsel in October 2020 containing Plaintiff's metadata, produced at Bates Nos. Epic Solutions 507- 521; and

   vi. A screenshot of the Adobe Bridge software (the program Epic allegedly used to compare Plaintiff's photo library with its own). Specifically, a screenshot of how Adobe Bridge displays a photograph's metadata, produced at Bates Nos. Epic Solutions 522-523.

50. This production did not include any additional documents or information required to be produced by the Court's Order. Specifically, this production does not include:

    i. Communications between Epic and the Grocer Defendants outside of any communications on Epic's "proofing system," nor an indication of whether such communications exist;

    ii. Physical copies of the Plaintiff's photographs in Epic's library;

    iii. The identity of the source of each photograph in Epic's photo library, including the name of Epic's source, and the specific photographs obtained from each source.

    iv. The identity of Epic's third party clients, including the name of each client, the state in which they are located, whether Epic provided any of Plaintiff's photographs to the third party client, and if so, which of Plaintiff's photographs was provided.

    v. Any financial or revenue documents.

51. Further, as of August 22, 2023, Defendants still have not produced:

    i. Supplemental responses to Plaintiff's Discovery Requests regarding the presence of Plaintiff's CMI when Defendants sourced the Photographs;

    ii. Advertising material from March 1, 2017 through December 31, 2022, or a discovery response stating Defendants do not have these documents;

    iii. Complete, unredacted copies of all documents previously produced in redacted form; and

    iv. The identity of any Grocer Defendants not already named in this matter, that are under the same corporate umbrella as a named Grocer Defendant, including any of the Grocer Defendants' locations outside of Louisiana.

52. Thus, the Mac Defendants have completely failed to produce a single document following the Hearing, in complete defiance of Court Orders. Meanwhile, Sullivan's has only provided unredacted copies of previously produced advertisements and has not produced any *new* documents or affidavits in defiance of Court Orders.

Adrien's and Piggly Wiggly's have only produced a single document since the Hearing, ignoring the vast majority of their obligations, and those documents were not only marked "Attorneys' Eyes Only" pursuant to the new Protective Order requested and drafted by Defendants' Counsel, but were also heavily redacted even though the Protective Order does not authorize redactions. Finally, Epic has produced only an affidavit, which does not fully comply with the Court's Order, and 106 pages of documents allegedly supporting Defendants' statements regarding Plaintiff's CMI.

53. None of the Grocer Defendants have made any further production since July 28th, even though several weeks have passed and it is now more than 30 days since the original deadlines to produce as Ordered by the Court at the Hearing. Moreover, Defendants still have not produced, *inter alia*, supplemental interrogatory responses, copies of photographs, copies of advertisements, revenue information, and relevant communications as Ordered by the Court.

54. Plaintiff has made repeated attempts to procure the requested documents and information, for more than six months before the Hearing, and now more than two months since the Hearing, Defendants continue to willfully disregard Court Orders, substantially prejudicing Plaintiff's ability to prosecute this action, including by entirely inhibiting Plaintiff's ability to estimate the value of this case.

Pursuant to 28 U.S.C. § 1746, I make this declaration under penalty of perjury, and certify that the foregoing facts are true and correct to the best of my knowledge.

Executed on August 24, 2023

/s/ *Shane Wax*
Shane Wax, Esq.[6]

---

[6] Admitted *pro hac vice*. [*See* R. Doc. 85].