UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| Prepared Food Photos, Inc., | No. 3:22-cv-37-TAD-KDM |
| *plaintiff,* | Judge Terry A. Doughty |
| versus | Magistrate Judge Kayla D. McClusky |
| Epic Solutions, LLC, ET AL., | **Jury Trial Demanded** |
| *defendants.* | |

### DECLARATION AND CERTIFICATION OF JOEL ALBRIZIO

I, Joel Albrizio, declare and certify as follows:

1.    I am the 100% owner of Prepared Food Photos, Inc. ("Plaintiff" or "PFP"), and currently serve as its Treasurer and a Board member, and was previously the President.  PFP is the Plaintiff in this lawsuit against Defendants Epic Solutions, LLC ("Epic") and several of its customers, including Adrien's Supermarket, Inc. ("Adrien's"), McDaniel Food Management, Inc., McLawrence Foods, L.L.C., McDaniel Foods of Alexandria, Inc., McDaniel Foods of Drew, LLC, McLawrence Foods of Swartz, Inc., McLawrence Foods of Oak Grove, Inc., McLawrence Foods of Columbia, LLC, McLawrence Foods of W. Monroe, LLC, (collectively, the "Mac Defendants"), Piggly Wiggly South Opelousas, LLC, ("Piggly Wiggly"), and Sullivan's Grocery LA#2 Inc., Sullivan's Inc Grocery, ("the Sullivan's Defendants") (collectively, the "Grocer Defendants,") (together with Epic, the "Defendants").  This affidavit is based on my personal knowledge, and my knowledge and review of PFP's business records.

1

2.     I first joined PFP (which was then doing business as Ad-Life Marketing & Communications Co.) as a W-2 employee in 1992. I later became an officer and owner of PFP, but at all times I have remained a W2 employee of the company.

3.     When I joined PFP in 1992, the company was already in the photograph licensing business, but it did not begin photographing and licensing photographs of food until my arrival and involvement. I am the one who created most of the images in PFP's food photography library, and in particular I created 39 of the 40 photographs at issue in this case that Epic and its customers used without PFP's permission and without payment to PFP.

4.     Those 39 photographs were taken by me, using a film camera, in the ordinary course of my employment with PFP with the understanding and desire that PFP own each of those photographs. When taking photographs of food items for grocery circulars, consistency is very important as the retailer is trying to establish a brand. Thus, typically I consider and adjust the lighting, angle, focus, depth and background to create a composition that PFP's customers will want to use. In particular, through a lot of trial and error, I learned that shooting food images at a 30-degree angle was best suited for grocery circulars and advertising because it displays the food items as "ready to eat" in the way that people think of them when sitting at the dining room table. It is very important that food photography used in grocery store advertising look appealing to consumers; otherwise, it does not draw them into the store.

5.     Color photography first started being used in circulars and advertising in the early to mid-1990s, when Gannett revolutionized the newspaper business by introducing 4-color photography in its publication USA Today. From that point on, we received thousands of requests from clients to shoot various food items for their circulars and advertising, and demand was

especially heavy during the period from 1994 to 1997.  It was during that time that I shot most of the photographs at issue in this case and we began to establish our library.

6.        It was my general practice after having the film developed and receiving back the prints to separate the individual prints with tissue paper-like material because otherwise prints stick to each other.  I would make handwritten notes that identified the subject of the image, the date it was taken, and the date it was first offered for license by PFP.  I would store individual films and prints, separated by these tissue-like papers, in manilla folders that would also be appropriately labeled.

7.        The only photograph at issue in this case that was not initially shot by me is a photograph identified on the registration certificate as "HamSliced001.jpg."  (*See* Exs. 4-A and 4-B to Second Amended Complaint, Dkt. 222-2, at 2, 5-6).  I note that the manilla folders I referenced earlier indicated that this photograph was taken by a different W-2 employee, David Ciolfi, during the ordinary course of his employment as a photographer for PFP, sometime before he was terminated by PFP in 2000.  It was not published or used "as is," however, because the quality of the photographs taken by Mr. Ciolfi were not up to PFP's and PFP's customers' standards.  According to our records on the manilla folders mentioned above, sometime in 2007 another W-2 employee of PFP took some of Mr. Ciolfi's original images and "photoshopped" them so they were significantly different from the images originally shot. Thus, even though Mr. Ciolfi was terminated in 2000, the deposit material for Registration No. VA 2-015-841 indicates that "HamSliced001.jpg" was created on "2/17/2007" and first published that same year even though Mr. Ciolfi was not a PFP employee in 2007.  It was our understanding, however, that even though copyright office regulations do not require that a person be named on a copyright registration application when the company is deemed the author as a work for hire for W-2 employees, that it

3

was the right thing to do to still give Mr. Ciolfi the credit as the original photographer of the images on that registration.

8.      In 1994, when our company was named AdLife, we entered into a contract with Multi-Ad Services Inc. d/b/a Multi-Ad Ad-Builder l/k/a LSA Creative Outlet ("Multi-Ad").  That June 8, 1994 contract (hereafter, the "Multi-Ad License") authorized Multi-Ad to grant licenses to allow third parties to use certain of our photographs.  Multi-Ad was not authorized to grant perpetual use licenses.  Attached as **Exhibit 56** to the accompanying declaration of Rebecca Jones are screenshots of Multi-Ad's website which accurately depict how PFP's photographs were offered for license through Multi-Ad's platform, namely in a manner that clearly indicates that all of the food photographs come from "AdLife" as we were then known.

9.      By letter dated November 11, 2016, PFP notified Multi-Ad that the Multi-Ad License was being terminated.  By letter dated November 30, 2016, Multi-Ad acknowledged the termination of the Multi-Ad License effective as of March 1, 2017.  In December 2016, PFP exchanged several more emails with Multi-Ad related to the termination of the Multi-Ad License, which were produced under bates numbers PFP006673-86.  The outcome of these discussions was a mutual agreement that Multi-Ad would notify all of its clients to inform them that they no longer had rights to use any of PFP's photographs.

10.      In fact, I personally visited Multi-Ad's website in 2017 to make sure that PFP's photographs had been removed from Multi-Ad's platform.  Attached as **Exhibits 54** and **57** to the accompanying declaration of Rebecca Jones are screenshots of Multi-Ad's website which accurately depict how Multi-Ad's platform appeared to any Multi-Ad clients (including Epic) in early 2017, namely with a "Special Message" that states that PFP "terminated their provider contract with LSA (formerly MultiAd/AdBuilder) effective March 1, 2017," and as a result, "after

February 28, 2017, you will no longer have the right to use any of the Adlife collections and our Creative Outlet subscription, Food Photography." Furthermore, **Exhibit 55** to the Jones Declaration contains a photograph that PFP took of a sample notice letter dated December 12, 2016 that PFP received from one of Multi-Ad's clients before this litigation, which also conveys this "special message" about the termination of the Multi-Ad License.

11.    After the March 1, 2017 termination of the Multi-Ad License, Multi-Ad's customer list was acquired by Metro Creative Graphics, Inc. ("Metro"). PFP has never had an agreement with Metro and has never provided any photographs to Metro. On April 26, 2024, I e-mailed Metro's President and CEO, Robert Zimmerman, to ask him to weigh in on Epic's claim that it obtained a license to use PFP's photographs from Metro. Mr. Zimmerman replied later that day, stating as follows:

> *Epic became a customer following our purchase of Creative Outlet in June 2017. They subscribe to our Metro Newspaper Service and Holiday Advertising Service. As you've known since our acquisition, we never took possession of any AdLife images.*

True copies of this e-mail exchange and are attached as **Exhibit 58** to the Jones Declaration.

12.    Epic was also informed that the Multi-Ad arrangement was terminated in 2017 by way of email exchanges between our counsel and Epic's counsel in 2020, attached to the Jones Declaration as **Exhibit 52**.

13.    Beginning in 2016, in preparation for the end of the Multi-Ad agreement, Plaintiff began using a website at PreparedFoodPhotos.com. Plaintiff adopted PreparedFoodPhotos.com as a "dba" beginning in 2016 before formally changing the name of the corporation to "Prepared Food Photos, Inc." in 2021. The Copyright Office was notified about the name change in July 2021 as evidenced by the documents attached as **Exhibit 60** to the Jones Declaration.

Pursuant to 28 U.S.C. § 1746, I make this declaration under penalty of perjury, and certify that the foregoing facts are true and correct to the best of my knowledge.

Executed on February 28, 2025.

_____
Joel Albrizio