UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| Prepared Food Photos, Inc. | Civil Action No. 3:22-cv-00037 |
| *plaintiff,* | District Judge Terry A. Doughty |
| versus | Magistrate Judge Kayla D. McClusky |
| Epic Solutions, LLC, ET AL., | **Jury Trial Demanded** |
| *defendant.* | |

**DEFENDANTS' MEMORANDUM SUPPORTING ITS MOTION FOR SUMMARY JUDGMENT ON AFFIRMATIVE DEFENSE OF COPYRIGHT MISUSE**

Respectfully submitted,

*s/ Alex P. Tilling*

**GEORGE D. FAGAN, T.A. (#14260)**
**ALEX P. TILLING (#29686)**
**KAREN E. FUTCH (#31164)**
**Leake Andersson LLP**
1100 Poydras, Suite 1700
New Orleans, Louisiana 70163-1701
Tel: 504-585-7500 / Fax: 504-585-7775
Email: *gfagan@leakeandersson.com*
*atilling@leakeandersson.com*
*kfutch@leakeandersson.com*

***Attorneys for Defendant, Epic***
***Solutions, LLC and Grocer Defendants***

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................... iii

Overview ................................................................................................................................. 1

Facts and Background ............................................................................................................. 7

Applicable Law ...................................................................................................................... 17

Standards Applicable to Motions for Summary Judgment .......................................... 17

Misuse of Copyright ............................................................................................................. 18

Argument ............................................................................................................................... 21

Conclusions ........................................................................................................................... 23

# **TABLE OF AUTHORITIES**

**Cases**                                                                 Page(s)

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
   166 F.3d 772 (5th Cir. 1999) ................................................................... 18, 19

*Berlenbach v. Anderson & Thompson Ski Co.*,
   329 F.2d 782 (9th Cir.) ............................................................................ 18

*CBS Broad., Inc. v. EchoStar Communications Corp.*,
   265 F.3d 1193 (11th Cir. 2001) ................................................................ 7

*Celotex Corp. v. Catrett*,
   477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d (1986) ................................... 17, 18

*Crawford v. Formosa Plastics Corp.*,
   234 F.3d 899 (5th Cir. 2000) ................................................................... 17

*DGI Techs., Inc.*,
   81 F.3d 597 (5th Cir. 1996) ..................................................................... 18

*Exxon Corp. v. St. Paul Fire & Marine Ins. Co.*,
   129 F.3d 781 (5th Cir. 1997) ................................................................... 18

*Harrington v. 360 ABQ, LLC*,
   2022 WL 1567094 (D.N.Mex., May 18, 2022) ....................................... 20, 22

*Home Design Servs., Inc. v. B & B Custom Homes, LLC*,
   2008 WL 2302662 (D.Colo. May 30, 2008) ........................................... 22

*Home Design Servs., Inc. v. Park Square Enters., Inc.*,
   2005 WL 1027370 (M.D.Fla. 2005) ........................................................ 23

*Knight v. Kellogg Brown & Root Inc.*,
   333 Fed.Appx. 1 (5th Cir. 2009) ............................................................. 17

*Lasercomb Am., Inc. v. Reynolds*,
   911 F.2d 970 (4th Cir. 1990) ................................................................... 18, 19, 20

*Little Liquid Air Corp.*,
   37 F.3d 1069 (5th Cir. 1994) ................................................................... 17

*Malibu Media, LLC v. Cuddy*,
    2015 WL 1280783 (D.Colo. Mar. 18, 2015) ........................................................... 21

*Malibu Media, LLC v. Miller*,
    2014 WL 2619558 (D.Colo. June 12, 2014) ......................................................... 21

*Morton Salt Co. v. G.S. Suppiger*,
    314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942) ................................................. 19

*On Davis v. The Gap, Inc.*,
    246 F.3d 152 (2nd Cir. 2001) ................................................................................. 5

*Oppenheimer v. ACL LLC*,
    504 F.Supp.3d 503 (W.D.N.C. 2020) .................................................................... 20

*Oppenheimer*,
    2022 WL 2704875 .................................................................................................. 22

*Practice Management Information Corp. v. American Medical Ass'n*,
    121 F.3d 516 (9th Cir. 1997) ........................................................................... 19, 20

*Prepared Food Photos, Inc. v. Mikey's Famous Marinades Corp.*,
    2023 WL 4867457 (E.D.N.Y. July 31, 2023) ....................................................... 16

*Prepared Food Photos, Inc. v. Patriot Fine Foods, LLC*,
    2022 WL 22824893 (S.D.Fla., March 22, 2022) .................................................... 16

*Price v. Federal Express Corp.*,
    283 F.3d 715 (5th Cir. 2002) ................................................................................ 17

*Q*ad, Inc. v. ALN Assocs., Inc.,
    974 F.2d 834 (7th Cir.1992) .................................................................................. 18

*Straus v. DVC Worldwide, Inc.*,
    484 F.Supp.2d 620 (S.D.Tex. 2007) ....................................................................... 5

Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors,
    786 F.2d 1400 (9th Cir.1986) ............................................................................... 18

*Vernor v. Autodesk, Inc.*,
    621 F.3d 1102 (9th Cir. 2010) .............................................................................. 18

**Statutes**

17 U.S.C.A. §102 .................................................................................................................... 19

U.S. Const. art. I, §8, cl. 8 ................................................................................................. 6, 19

**Rules**

Fed.R.Civ. P. 1 ..................................................................................................................... 18

Rule 56 of the Federal Rules of Civil Procedure ............................................................. 1, 17, 18

Defendant Epic Solutions, LLC ("Epic") and all co-defendants ("Grocer Defendants," collectively, with Epic, "Defendants")[1] are entitled to summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure and any other applicable law, on the entirety of claims made in the captioned matter by Prepared Food Photos, Inc., plaintiff herein ("PFP" or "Plaintiff"), as PFP has misused any applicable copyrights[2] and abused the legal system in a manner contrary to the public policy embodied in copyright law. PFP should, therefore, be barred from enforcing the misused copyrights in this action.

## I. **OVERVIEW**

In the face of a declining market for the bona fide licensing of stock food photography, PFP, the alleged owner of an 18,000-image stock food photography library ("the image library"),[3] pivoted away from a licensing-focused business model to one driven by threats of copyright infringement litigation through which PFP actively works to extract sums from actual or potential litigants that far exceed the true value of the food photographs in the image library.[4] Despite

---

[1]  "Grocer Defendants" shall collectively refer to Adrien's Supermarket, Inc. ("Adrien's"), Sullivan's Grocery La #2., Sullivan's Inc. Grocery ("Sullivan Defendants"), Piggly Wiggly South Opelousas, LLC ("Piggly Wiggly), McDaniel Food Management, Inc., McDaniel Foods of Alexandria, Inc., McDaniel Foods of Drew, LLC, McLawrence Foods, LLC, McLawrence Foods of Swartz, Inc., McLawrence Foods of Oak Grove, Inc., McLawrence Foods of Columbia, LLC and McLawrence Foods of W. Monroe, LLC, ("Mac Defendants").

[2]  Epic disputes that PFP owns the copyrights to which it claims and submits that this is a factual issue for the jury to determine.

[3]  PFP has offered varying numbers of total images in the image library in its pleadings, including 18,000, 25,000, and 30,000 images. Given that PFP identified the image library as containing 18,000 images during its corporate deposition in this matter, Defendants will assume this as the accurate total number of images for purposes of this motion.

[4]  Including over 270 lawsuits since 2016 (see the Declaration of Adrienne C. Love in *Prepared Food Photos, Inc f/k/a Adlife Marketing & Communications Co., Inc. v. Weneedavaction.com, LLC*, 1:23-cv-11085 (D.Mass.), See Exh. 9 (R.Doc. 33-5, which includes a chart to 272 PACER citations, starting at P. 3), over 560 settlements (*See* Halle Matthews Report, previously attached to R. Doc. 250 herein as Exhibit 11 at P. 32, ¶69, matrix contained in Exhibit 14 thereto beginning at P. 42 of 68) and thousands of demand letters

---

claiming to be in the stock food photography business, and despite claiming in newly filed lawsuits and motions seeking default judgments that PFP is still generating new image content,[5] PFP has admitted under oath that it employs no photographers, employs no chefs, owns no brick-and-mortar buildings, and has not contributed a single new image to the image library since it registered the copyrights asserted in this litigation and first posted the image library to its website[6] in 2017[7]. PFP does not maintain a physical office and its operations currently consist of just two employees, each of whom search the internet for potential "infringements" from their laptops while at home and report their results to a supervisor who then consults with a legal team to prepare settlement demand letters and/or correspondence threatening litigation.

PFP alleges in pleadings that its revenue is primarily derived from fees collected by selling subscriptions to access the image library, which PFP claims can only be purchased for its "standard terms": a minimum fee of $999/month for a minimum 12-month term with full-library access the only purchase option (i.e., access to even a single image purportedly costs a minimum of $11,988, which would have to be paid annually to assure continued access). However, PFP has identified

---

(see Exh. 10, *Prepared Food Photos, Inc., f/k/a Adlife Marketing & Communications Co., Inc. v. Clyde's Chicken King, Inc.,* 6:24-cv-00351 (W.D.La.), R. Doc. 8-2, page 4, ⁋28).

[5] Halle Matthews Report, Exhibit 11 to R. Doc. 250, P. 9, ⁋20; (PFP alleges "Plaintiff's business model relies on its recurring monthly subscription service such that Plaintiff can continue to maintain its impressive portfolio."); see also *Prepared Food Photos, Inc., v. Andelora Industries, LLC d/b/a Dogs R Us,* 6:24-cv-0220 (M.D. Fla.), R. Doc. 1, P. 3 of 8, ⁋ 9, (filed 12-6-24); *Prepared Food Photos, Inc. v. Agriscaping Technologies LLC,* 0:24-cv-62305 (S.D.Fla.) R. Doc. 1, P. 3 of 8, ⁋ 9, (filed 12-5-24); *Prepared Food Photos, Inc. v. Burch Farms, Inc.,* 1:24-cv-00346 (W.D.Pa.), R. Doc. 1, P. 2 of 8, ⁋ 9, (filed 12-27-24); *Prepared Food Photos, Inc., v. Busch's Inc. d/b/a Busch's Fresh Food Market,* 2:24-cv-13313 (E.D.Mich.), R. Doc. 1, P. 2 of 8, ⁋ 9, (filed 12-12-24).

[6] http://www.preparedfoodphotos.com

[7] Exh. 6 (Rebecca Jones Depo, P. 72, L. 10-18); Exh. 3 (Joel Albrizio Depo, P. 178, L. 23-25 & P. 179, L. 1-5).

only 27 subscription agreements that have been signed since PFP began offering its full-library subscription model over eight years ago, and the "subscribers" consist of actual or potential defendants who have signed subscription agreements as settlement for actual or threatened lawsuits; or of legacy subscribers to one of PFP's prior vendors who have agreed to "subscribe" in order to avoid the complications of business interruption and the express threat of future litigation by PFP. The record lacks any evidence that a willing purchaser has ever executed a subscription agreement with PFP as part of a fair market transaction. Even so, PFP has further admitted in this matter that its "subscription fee" revenue represents but a small fraction of its overall income, which is overwhelmingly generated from settling lawsuits and executing pre-lawsuit settlement agreements. In fact, PFP's subscription fee income would barely cover a quarter of its payroll, making it far from the "substantial revenue source" PFP has claimed[8] it to be.

Prior to instituting its "subscription model," PFP licensed stock food images through third-party vendors on a per-image basis and was paid a percentage-based commission from those vendors.[9] PFP did not receive a record identifying the entities who licensed its images from these vendors nor did PFP receive a record of the terms under which each image was licensed in these transactions. PFP merely received a commission check for its corresponding percentage on a monthly or quarterly basis. That commission income barely reached six figures annually, and had

---

[8]     And continues to claim in newly filed lawsuits and in sworn trial testimony. *See*, for example, (Complaint filed in *Prepared Food Photos, Inc. f/k/a Adlife Marketing & Communications Co., Inc. v. Agriscaping Technologies, LLC*, 0:24-cv-62305 (S.D.Fla.), P. 3, ¶9 (PFP "relies on its recurring monthly subscription service such that [PFP] can continue to maintain its impressive portfolio"); *see also* Exh. 11 (Trial testimony of Rebecca Jones in *Prepared Food Photos, Inc. v. Sharif Jaber and Nofal, LLC d/b/a Food Town Mart*, 2:22-cv-642 (E.D.Wisc.), P. 63, ln. 15-20 ("Q: Other than offering images to your subscribers, as you said, does PFP have any other line of business?  A: No.  Q: So if PFP is making money, it is from offering subscriptions to its subscribers?  A: Yes.").

[9]     This included iStock/Getty and a company formerly known as Multi-Ad, which later became LSA Creative and which subsequently sold some assets to Metro.

been decreasing for years before falling into the five figures in the final year before PFP pulled its images from the third-party vendors and created the image library for in-house management of subscriptions. Since making this pivot away from third party licensing of individual photographs to offering first party subscriptions to the entire image library, however, PFP has only earned an annual subscription revenue exceeding six-figures twice, earning less than six figures in all other years.[10]

In contrast, PFP has earned revenue exceeding seven figures in all but one year since 2020[11] from amounts received via settlements of actual or threatened litigation. This litigation income bears no connection to the value of the stock food images in the image library or any applicable copyrights. Rather, the litigation income is a direct result of PFP seeking exorbitant amounts in its settlement demands and then using the cost of litigation to coerce the threatened litigants to pay an amount in excess of the images' value to avoid or exit litigation. Most disturbingly, PFP uses prior litigation to fuel its future threats by citing to prior damages awards in its demand letters as support for its oppressive settlement demands. PFP does not advise the recipients of these letters that the damages "awards" cited are actually from cases in which a court entered a *default judgment* and relied solely upon PFP's representations as to the value of the image library.

Notably, PFP claims in its default judgment pleadings that its $11,988 annual subscription fee[12] is necessary to fund PFP's continual and "ongoing" efforts to update the content of the image

---

[10]    And even then, it appears that many of the subscription agreements were made part of larger settlement agreements to resolve litigation.

[11]    2021, which was likely affected by the Covid-19 pandemic.

[12]    Which is the minimum amount it claims an infringer owes even if the infringer only used a single image one single time.

library, and further claims that the subscription fee represents fair market value for its images because: (1) PFP has subscribers who pay the identified amount; and (2) PFP offers semi-exclusivity to its subscribers, which induces them to pay a premium to restrict access to their competitors.  PFP makes these representations because it understands that its damages must be tied to the value of its copyrighted material to be properly recoverable.[13]  However, as this memorandum makes plain, PFP has *not* been engaged in *any* efforts to add image content to its photo library since at least 2017 when it pivoted to its current litigation-driven business model.[14]  Additionally, as noted above, not a single customer has purchased a subscription to access the full image library as part of any fair market transaction, given that all the subscription agreements have been executed under the threat of litigation or following receipt of a cease-and-desist letter.[15]  Further, PFP cannot truly offer exclusivity or semi-exclusivity to its subscribers since it does not know the identities of everyone who licensed one of its images from its prior third-party vendor relationships and it does not know whether any such licenses are still valid.[16]  Moreover, PFP testified that it does not obtain the same results each time it conducts a reverse-image search on an image in its library and sometimes it does not discover an allegedly infringing use until well after

---

[13]    *See* Exh. 8 (PFP's Motion for Default Final Judgment and Memorandum in Support filed in *Prepared Food Photos, Inc. f/k/a Adlife Marketing & Communications Co., Inc. v. Annadele, Inc. d/b/a Annadele's Plantation*, 2:23-cv-7155 (E.D.La.),(Rec. Doc. 12.  PFP cites *Straus v. DVC Worldwide, Inc.*, 484 F.Supp.2d 620, 648 (S.D.Tex. 2007) and *On Davis v. The Gap, Inc.*, 246 F.3d 152, 164-68 (2nd Cir. 2001), while noting that "[p]roof of industry practice 'inarguably is crucial to the estimation of actual damages'" and acknowledging that "a copyright holder's actual damages are determined by what a willing buyer would have been reasonably required to pay a willing seller for using."

[14]    And likely even earlier.

[15]    And many still pay a discount from the alleged "standard terms" and/or are given additional use rights that exceed the "standard terms" without paying an increased amount.

[16]    PFP testified that it often issues demand letters to entities that later produce evidence of obtaining a license from iStock prior to PFP pulling its images from that vendor.  In those situations, PFP ceases demand efforts concerning the image in dispute with that recipient.

the fact (sometimes several years).[17]  Accordingly, PFP would have no way of credibly offering exclusivity to its subscribers and cannot reasonably claim exclusivity as evidence of the subscription's value.[18]

In the end, it is the default judgments themselves, in which courts have relied on PFP's uncontested justifications of its library's value, that PFP is using to drive its litigation business. The award amounts in the default judgments are cited in PFP's demand letters as support for the amounts demanded therein, thereby lending an air of legitimacy to PFP's demands.  The default judgment awards are not tied to the true value of the claimed copyrights, however, and instead represent an abuse of the legal system and an overextension of the rights bestowed by the copyright laws.

The result is a misuse of copyright that prohibits PFP from enforcing its copyrights against Defendants in this matter.  The public policy underlying copyright law is the desire "to promote the progress of science and useful arts."  U.S. Const. art. I, §8, cl. 8.  The basic objective is seeking "to promote the dissemination of creative expression, and provide incentives for copyright owners to produce … original works."[19]  Permitting PFP's litigation business to persist discourages the creation of original works as PFP has stopped creating original content and has decided that litigation is more lucrative and more valuable than creating new stock food photography.  Further,

---

[17]    *See* Exh. 6 (Deposition of Rebecca Jones, P. 27-29; P. 29 discussing the Google image search process: "A: And it varies day to day, also.  You could do the same image today and then do it again … in a couple of days or next week and get completely different results"); and note, for example, the Complaint from *Weneedavaction.com, LLC, supra*, 1:23-cv-11085, which was filed May 15, 2023 but asserts an infringing use that allegedly occurred on April 11, 2016 (R. Doc. 7, ¶16).

[18]    Additionally, there is no evidence that any subscribers actually paid a premium for exclusivity or semi-exclusivity, particularly considering that the "purchases" were made under coercive circumstances.

[19]    *CBS Broad., Inc. v. EchoStar Communications Corp.*, 265 F.3d 1193, 1211 (11th Cir. 2001).

permitting PFP to continue to cite the prior default judgments obtained in its favor, which are not tied to the actual value of PFP's image library, extends to PFP a right beyond that which is properly bestowed upon a copyright holder.  PFP is engaged in copyright misuse and summary judgment should be granted in Defendants' favor.

## II.  FACTS AND BACKGROUND[20]

PFP holds itself out as a company "formed for the principal purpose of creating and licensing photographic works of prepared food items, primarily through its website, preparedfoodphotos.com."[21]   A self-identified "veteran in [its] industry," PFP states that it "specializes in creating original photographic works of food items" and states further that its "business relies on the licensing of these original works to grocery stores, marketing companies, and other companies and individuals who wish to use the works for, among other things, supermarket circular advertisements (whether online or print versions) …", etc.[22]  PFP  was itself created after Adlife Marketing, Inc. and Adlife Marketing & Communications Company, Inc. (collectively referred to herein as "Adlife") "merged and changed their corporate name to PFP[.]"[23]  PFP, therefore, claims to own "any copyright registrations filed under its prior corporate names."[24]

---

[20]     The undisputed material facts and other circumstances involved here are separately set forth and described in Defendants' separate Statement of Uncontested Material Facts filed in accordance with Local Civil Rule 56.1 and in the Exhibits submitted with this Motion.

[21]     Rec. Doc. 222, P. 2, ¶2.

[22]     Rec. Doc. 222, P. 9, ¶38.

[23]     Rec. Doc. 222, P. 2, ¶2.

[24]     Id.

PFP (as Adlife) has allegedly been curating "a library of still images of food and other grocery items" since 1978.[25]  "The process for creating an image to be included in Adlife's food photography library would typically include an Adlife employee creating a preliminary sketch of the image, sending the sketch to a kitchen to have the food prepared, and then having the photographer style the food on the plate before taking the photograph."[26]  "When Adlife needed to publish [a] photograph, it would then be color corrected and color separated for consistency with the rest of Adlife's food photograph library."[27]

Prior to 2017, PFP[28] maintained a relationship with third-party vendor Multi-Ad, Inc. ("Multi-Ad")[29] whereby Multi-Ad sold images obtained from PFP to its own customers and then paid PFP a portion of its proceeds in commission payments.[30]  Additionally, third-party vendor iStock/Getty sold per-image licenses of images obtained from PFP to iStock/Getty's customers and paid a portion of the proceeds to PFP in commission payments "[b]eginning in 2007."[31]  The licenses offered by the third-party vendors included non-exclusive perpetual use licenses.[32]  The third-party vendors did not disclose to PFP the identities of the sublicensees, the terms of any

---

[25]    *See* Exh. 1 (Adlife's Motion for Summary Judgment filed as Rec. Doc. 95 in *MyWebGrocer, Inc. v. Adlife Marketing & Communications Co., Inc.*, 5:16-cv-00310 (D.Vt.), P. 2).

[26]    Exh. 1 (MyWebGrocer, Rec. Doc. 95 at P. 2).

[27]    Exh. 1 (MyWebGrocer, Rec. Doc. 95 at P. 2).

[28]    As Adlife.

[29]    Rec. Doc. 222, P. 20, ¶84

[30]    Exh. 1 (MyWebGrocer, Rec. Doc. 95 at P. 3) (The commissions model is identified with respect to iStock/Getty at Exh. 2 - Rec. Doc. 21-4 from *Prepared Food Photos, Inc., et al. v. Pool Word, Inc.*, 2:23-cv-00160 (E.D.Wash.), response to Interrogatory No. 13, P. 20).

[31]    Exh. 1 (MyWebGrocer, Rec. Doc. 95 at P.3).

[32]    Exh. 1 (MyWebGrover, Rec. Doc. 95 at P. 15).

individual license, nor the amounts collected from the licensees.[33] PFP even continued to do business with a third-party vendor, despite requesting an audit for a list of identities of licensees from the third-party vendor and receiving no list during the time the images were available through the third-party vendor.[34]

PFP did not seek to register copyrights in any images from 1978 to 2015. During the period when PFP was receiving commission payments from the third-party vendors, the images did not contain any copyright notice, copyright management information, or other markings indicating authorship.[35] The images were put to use in various ways through various mediums, including both print and online advertisements. In October 2016[36] and November 2016,[37] PFP allegedly "terminated its relationship[s]" with the third-party vendors[38] and thereafter sought registration of copyrights to several thousand images – the majority of which were taken in the 1990s and early 2000s.[39] The registrations were sought and obtained in 2016 and 2017.[40] PFP thereafter combined the associated images into the image library and made it available on its website, preparedfoodphotos.com.[41] Beginning in 2017, PFP allegedly restricted access to the image library to customers with an active subscription. PFP claims that its standard full-library

---

[33] Exh. 2 (Pool World, Rec. Doc. 21-4, P. 7-8, Response to RFP No. 3; P. 9, Response to RFP No. 8; P. 19, Answer to Interrogatory No. 9; P. 20, Answer to Interrogatory No. 16).

[34] Exh. 3 (Joel Albrizio Depo, P. 164, L. 17-21).

[35] R. Doc. 94-09, P. 3, ¶9.

[36] In the case of iStock/Getty.

[37] In the case of Multi-Ad.

[38] Exh. 1 (MyWebGrocer, Rec. Doc. 95 at P. 3).

[39] Including the images at issue in this matter. *See* Exh. 3 (Joel Albrizio Depo, P. 71, L. 24-25 & P. 72, L. 1).

[40] Exh. 4 (PFP009307-9314).

[41] Exh. 5 (Douglas Fleurant Depo, P. 92, L. 2-12).

subscription costs $999 per month with a minimum one-year term.[42]   Accordingly, access to any one image contained in the library, which had previously been available for as little as $1 through the third party stock photography vendors, would cost a single user $11,988 under the new model. PFP thereafter tasked employees to conduct reverse-images searches on the internet for the purpose of identifying use of any registered images by non-full library subscribers.[43]   Those identified would then receive a demand letter seeking a monetary settlement and threatening litigation.[44]

      PFP's owner, Joel Albrizio, "began working for Adlife as an employee in 1992, and in 1994 [he] purchased a portion of Adlife's stock and became an[ ] officer of the company."[45]   Mr. Albrizio was a co-shareholder of Adlife along with John Puccio and Celestino DiGiovanni until 2011, when Mr. Albrizio became the sole shareholder.[46]   Mr. Albrizio then "oversaw the process of choosing th[e] photographs that would become Adlife's current library."[47]   Despite Adlife allegedly having produced "hundreds of thousands"[48] and perhaps "millions" of food images over its decades of existence, "[o]nly 25,000+ have been registered with the Copyright Office and saved to what is now the present [PFP] library …".[49]   The vast majority of the copyright registrations associated with images in the image library identify Mr. Albrizio as the author,[50] even though Mr.

---

[42]     Rec. Doc. 222, P. 9, ¶39.

[43]     Exh. 3 (Rebecca Jones Depo, P. 27, L. 1-25 & P. 38, L. 3-19).

[44]     Exh. 3 (Rebecca Jones Depo, P. 38, L. 15-19).

[45]     Declaration of Joel Albrizio, Rec. Doc. 107-5 in *MyWebGrocer, supra*, at P. 3, ¶8.

[46]     Exh. 2 (*Pool World, supra*, Rec. Doc. 21-4, Answer to Interrogatory No. 4, P. 18).

[47]     Exh. 12 (*MyWebGrocer, supra*, Rec. Doc. 107-5 P. 6, ¶25).

[48]     Exh. 12 (*MyWebGrocer, supra*, Rec. Doc. 107-5, P. 6, ¶24).

[49]     Exh. 12 (*MyWebGrocer, supra*, Rec. Doc. 107-5, P. 6, ¶24).

[50]     Exh. 12 (*MyWebGrocer,, supra*, Rec. Doc., 107-5, P. 5, ¶16; P. 6, ¶26).

Albrizio has acknowledged that he cannot say who actually took any particular photograph contained in the image library.[51]

At least one former Adlife employee has questioned whether Mr. Albrizio took any of the photographs at issue, including its former Director of Photography, who could not recall Mr. Albrizio ever working with any of the photography team during the years when the photographs in the image library were allegedly taken.[52]  Mr. Albrizio has responded by stating that he "primarily worked on [his] own and did not work with the staff photography team."[53]  He further asserts that "[his] work was not managed or overseen by the Director of Photography"[54] and that he often took photographs after hours including at a home studio, outside the presence of the image sketchers, the chefs or the rest of the photography team identified as part of Adlife's standard production practice during the period when the images were allegedly taken.[55]

PFP has not sought to register copyrights in any additional images since registering the copyrights for images in the image library in 2016 and 2017.[56]  Mr. Albrizio claims that when the photographs were originally taken in the 1990s and early 2000s, "[his] custom and practice was to make notations on the pieces of tissue paper that separated and were stored with the film plates."[57] He further asserts that "[o]nce Adlife went digital, all of those pieces of film were scanned and uploaded, and the information from those handwritten notes was then stored in the metadata of the

---

[51]    Exh. 3 (Joel Albrizio Depo, P. 152, L. 16-25 & P. 153, L. 1).

[52]    Exh. 12 (MyWebGrocer, Rec. Doc. 93-47, ₱7, 10).

[53]    Exh. 12 (MyWebGrocer, Rec. Doc. 107-5, P. 4, ₱11).

[54]    Exh. 12 (MyWebGrocer, Rec. Doc. 107-5, P. 4, ₱11).

[55]    Exh. 3 (Joel Albrizio Depo, P.  21-25).

[56]    Exh. 6 (Rebecca Jones Depo, P. 52, L. 15-25 & P. 53, L. 1).

[57]    Exh. 12 (MyWebGrocer, Rec. Doc. 107-5, P. 4, ₱14).

digital file."[58]  Even though PFP concedes that its registration of the copyrights to these images is not itself proof of ownership given the inordinate passage of time between when they were allegedly taken/published and when they were registered,[59] PFP states that "[t]he hard records Adlife previously maintained were destroyed at some point after the digitization of the images [ ] took place."[60]

When PFP was collecting commissions from its third-party vendors, it barely made amounts in the six figures and had seen a decrease in year-over-year receipts, particularly from 2012 to when it ended those relationships in 2016-17.  By the end of those relationships, the amounts PFP was receiving in commissions had dipped well into the five figures.[61]  PFP made the decision to pull its images from the third-party vendors and to obtain copyright registrations with the specific intent to begin filing copyright infringement actions.[62]

By the time PFP had instituted its "subscription model," it did not employ any photographers, any food preparation professionals, or anyone involved with creation of new image content for the image library.[63]  As of at least 2020, PFP does not own, operate or use a studio of any kind.[64]

---

[58]     Exh. 12 (MyWebGrocer, Rec. Doc. 107-5, P. 4, ¶14).

[59]     *See* Exh. 13 (*Prepared Food Photos, Inc., f/k/a Adlife Marketing & Communications Co., Inc. v. Nofal, LLC d/b/a Food Town Mart and Sharif Jaber*, 2:22-cv-642 (E.D.Wisc.) R. Doc. 36, P. 7).

[60]     Exh. 12 (MyWebGrocer, Rec. Doc. 107-5, P. 5, ¶18).

[61]     Exh. 5 (Douglas Fleurant Depo, P. 92, L. 13-24 & P. 93, L. 1-10; P. 161-162 discussing Exhibit 13, which was PFP's responses to Pool World's Second Set of Interrogatories in Pool World), supra, and *see also Pool World*, supra, 6:24-cv-351, R. Doc. 8-4, P. 37-38, Interrogatory No. 21 and PFP's response thereto.

[62]     Exh. 5 (Douglas Fleurant Depo, P. 93, L. 14-24 & P. 94, L. 1-7).

[63]     Exh. 6 (Rebecca Jones Depo, P. 72, L. 10-18).

[64]     Exh. 6 (Rebecca Jones Depo, P. 73, L. 3-6).

Today, PFP does not maintain a physical office and its operations consist of two employees who run Google reverse-image searches of PFP's photo library on the internet (from their laptops while at home) in search of potentially unauthorized uses that they then report to a supervisor, Rebecca Jones.  Ms. Jones then meets with PFP's legal team and determines which uses warrant demand letters or threats of infringement litigation.  The Google reverse-image searches yield inconsistent results that differ from search to search, and sometimes potentially unauthorized uses are not discovered until significantly after the fact (sometimes years afterward).[65]

When PFP sends a demand letter, it has no certainty on the question of whether the intended recipient has a valid license to use the image or images at issue because PFP has no knowledge of licensees or terms for any licenses sold by the earlier third-party vendors.  When a letter recipient presents evidence of a valid license, PFP relents and does not pursue infringement over that image with the recipient any further.[66]

Revenue from subscriptions has remained significantly low for PFP since moving to its current model, only reaching six figures in two years and reaching only five figures in the years remaining.[67]  These amounts are insufficient to cover PFP's operations as the subscription revenue would not or barely cover a quarter of PFP's payroll in any given year.[68]  In the meantime, PFP generates seven figure ANNUAL revenue from collecting lawsuit settlements and settlements of

---

[65]    Exh. 6 (Rebecca Jones Depo, P. 28, L. 14-25; P. 29, L. 1-10; P. 84, L. 22-25; & P. 85, L. 1-25).

[66]    Exh. 6 (Rebecca Jones Depo, P. 44, L. 16-25).

[67]    Exh. 5 (Deposition of Douglas Fleurant, P. 164-165 discussing Exhibit 14, which was PFP's responses to interrogatories in Weneedavaction, supra, wherein PFP disclosed its subscription revenues from 2017 through August 31, 2023); see also Weneedavaction, supra, 1:23-cv-11085, Rec. Doc. 33-3, P. 10, Response to Interrogatory No. 17.

[68]    Exh. 5 (Douglas Fleurant Depo, P. 168) and compare with the subscription revenues PFP identified in response to discovery in Weneedavacation, supra, R. Doc. 33-3, P. 10, Response to Interrogatory No. 17

pre-lawsuit demands.[69]  The overwhelming majority of PFP's income comes from litigation and threatened litigation.

PFP has identified 27 subscription agreements that it has allegedly sold since 2017.[70]  Of the subscription agreements identified, many were actually executed as part of a formal settlement agreement to resolve pending or threatened litigation;[71] while others were executed by former subscribers to Multi-Ad/Metro after those entities received letters from Metro advising that its arrangement to provide Food Photography by Adlife had terminated and after PFP/Adlife had also sent a letter warning that further use of images obtained from the Food Photography product sold by Multi-Ad would amount to infringement.[72]  Those letters from PFP/Adlife also advised the recipients that PFP/Adlife was now offering its image library on a new in-house subscription basis.[73]  Some subscribers also obtained subscriptions at discounted prices or were granted deviations from the "standard terms" because they were customers of PFP's sister company, Bad-Adz, which performs advertising services similar to those of Epic in this case, including creation of advertisements and management of online presence, social media, etc.[74]  PFP cannot identify

---

[69]    Exh. 5 (Douglas Fleurant Depo, P. 144-146 and PFP008445, attached as Exhibit 9 to Mr. Fleurant's deposition).

[70]    As summarized in the matrix found at Exhibit 13 of the report prepared by PFP's expert CPA, Halle Matthews (Exhibit 11 to R. Doc. 250) and discussed in her report at P. 27 to 32, ¶64-68.  Ms. Matthews was recently deposed and testified that she knew of no subscribers to PFP's image library who became subscribers by visiting the website and requesting to purchase a subscription; rather, all "subscribers" obtained subscriptions as part of or concurrently with a settlement agreement, or were legacy subscribers of Multi-Ad/LSA/Metro who received a letter advising that any further use of the images would result in potential litigation (will supplement with transcript upon receipt; *see also* Exh. 6 (Deposition testimony of Rebecca Jones, P. 115-116).

[71]    Exh. 6 (Rebecca Jones Depo, P. 177, L. 22-25 & P. 178, L. 1-15).

[72]    Exh. 6 (Rebecca Jones Depo, P. 177, L. 22-25 & P. 178, L. 1-15).

[73]    Exh. 6 (Rebecca Jones Depo, P. 114, L. 24-25 & P. 115, L. 1-5).

[74]    Exh. 6 (Rebecca Jones Depo, P. 136, L. 4-14).

any subscriber from 2016 to present who simply visited PFP's website and willingly decided to purchase a subscription as part of a fair market transaction.[75]

When PFP moved to its subscription model, it also began pursuing default judgments in copyright infringement suits it was filing.[76]  In its pleadings seeking default judgment awards, PFP acknowledges its burden to establish the fair market value of its photo library.  In those pleadings, PFP asserts that its $11,988 annual price to access even a single library image is justified to cover the cost of PFP's "ongoing" efforts to update the library and to add new image content[77].PFP also asserts that its subscription price is evidence of fair market value because: (1) it has some subscribers paying this price; and (2) it offers its images on an exclusive or semi-exclusive basis such that subscribers pay a premium to restrict access by its competitors.[78]  Courts have entered default judgments and rendered default awards specifically in reliance upon PFP's representations as to its library's fair market value.[79]

---

[75]     See footnote 70, supra.

[76]     *See*, for example, Exh. 7 (PFP demand letter to a litigant found at R. Doc. 21-11 of *Pool World, supra*, 2:23-cv-160), which cites to past awards obtained by PFP as a "measuring stick," but which are all default judgments, including *Prepared Food Photos, Inc. v. Patriot Fine Foods, LLC*, (S.D.Fla., March 22, 2022); *Prepared Food Photos, Inc. v. Fat Daddy Co.*, (S.D.Fla. Nov. 29, 2022); *Prepared Food Photos, Inc. v. Perry Wings Plus, Inc.* (S.D.Fla. Dec. 19, 2022); *Prepared Food Photos, Inc. v. Silver Star of Brooklyn/Brooklyn's Best, Inc*., (E.D.N.Y., Jan. 23, 2023); *Prepared Food Photos, Inc. v. Trip Rest., LLC* (S.D.N.Y. April 14, 2023)

[77]     *See*, for example, Exh. 8 (PFP's Motion for Default Final Judgment and Memorandum in Support, R. Doc. 12, filed May 8, 2024 in *Prepared Food Photos, Inc., f/k/a Adlife Marketing & Communications Co., Inc. v. Annadele, Inc. d/b/a Annadele's Plantation*, 2:23-cv-7155, P. 15). ("Plaintiff's library of photographs was created over a 15-20 year period of time (with new creative works being made through the present date)" and discussing associated costs with "ongoing" image creation)

[78]     *See*, for example, Exh. 8 (PFP's Motion for Default Final Judgment and Memorandum in Support filed in *Annadele, supra*, at P. 14).

[79]     *See*, for example, *Prepared Food Photos, Inc. v. Patriot Fine Foods, LLC*, 2022 WL 22824893, *4 (S.D.Fla., March 22, 2022)(granting default judgment and noting in support that "Plaintiff has numerous clients who pay this annual subscription fee"); *Prepared Food Photos, Inc. v. Mikey's Famous Marinades Corp.*, 2023 WL 4867457, *2 (E.D.N.Y. July 31, 2023) (relying upon PFP's representations and also noting several other default judgments obtained by PFP in the same jurisdiction).

PFP cites the default judgment awards in its demand letters as authority for the amounts demanded, in which PFP often seeks $30,000 for an alleged single infringing use of a single or small amount of images.[80]  As PFP obtained additional and bigger default judgment awards, it began including these citations and increased the amounts it demanded in its letters.[81]  PFP does not advise the recipients of these letters that the judgments cited were default judgments.[82] PFP additionally uses prior default judgment awards as authority when seeking new default judgment awards and does not advise the courts from which the new default judgment relief is requested that the citations are all from prior default judgments.[83]

PFP continues to base its settlement demand amounts on the amounts awarded in default judgments.  However, PFP has not actually collected on the majority of these default judgment awards that it cites as authority for its settlement demands, having only just collected on a default judgment for the first time last year.[84]  That default judgment was based on the same representations from PFP outlined above.  PFP has elected not to enforce the other default judgments it has obtained.

## **APPLICABLE LAW**

1.    **Standards Applicable to Motions for Summary Judgment.**

---

[80]    *See*, for example, Exh. 7 (R. Doc. 21-11 from *Pool World, supra*, 2:23-cv-160 at P. 5-6).

[81]    See Exh. 14 (Compare FN 81 above to the demand letter dated September 21, 2016 found at R.Doc. 55-8 in *Pool World, supra*.)

[82]    *See* Exh. 7 (R. Doc. 21-11 from *Pool World, supra*).

[83]    *See* Exh. 8 (PFP's Motion for Default Final Judgment and Memorandum in Support filed in *Annadele, supra*, R. Doc. 12, at P. 17-18), wherein PFP cites nearly two pages of default judgments as evidence that "a multitude of other courts" have awarded PFP damages without noting that the citations are all to default judgments.

[84]    Exh. 5 (Douglas Fleurant Depo, P. 145, L. 15-20).

The standards and principles applicable to Motions for Summary Judgment based on Federal Rule 56 are well-established:

"Summary judgment is proper when the evidence reflects no genuine issues of material fact, and the movant is entitled to judgment as a matter of law." *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Id.* "On a motion for summary judgment, a court must review the facts in the light most favorable to the non-movant." *Price v. Federal Express Corp.*, 283 F.3d 715, 719 (5th Cir. 2002). The Court will "resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. [The Court will] not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Little Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Fed. R. Civ. P. 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 165 (1986); *see also Knight v. Kellogg Brown & Root Inc.*, 333 Fed.Appx. 1, 6 (5th Cir. 2009).

As the United States Supreme Court has made clear, summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)(quoting Fed.R.Civ. P. 1); *accord Exxon Corp. v. St. Paul Fire & Marine Ins. Co.*, 129 F.3d 781, 786 (5th Cir. 1997)("[t]he policy

goal that animates Rule 56 is the prompt disposition of cases where there is no genuine issue of any material fact for the court to consider").

### 2.    Misuse of Copyright

"A successful defense of misuse of copyright bars a culpable plaintiff from prevailing on an action for infringement of the misused copyright." *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 972 (4th Cir. 1990); *see also Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 792-93 (5th Cir. 1999); *DSC Commcns. Corp. v. DGI Techs., Inc.*, 81 F.3d 597, 601 (5th Cir. 1996), quoting *Lasercomb, supra*; *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1115 (9th Cir. 2010). The copyright misuse doctrine "…has its historical roots in the unclean hands defense…." *Alcatel USA*, 166 F.3d at 792; citing *Q*ad, Inc. v. ALN Assocs., Inc., 974 F.2d 834, 836 (7th Cir.1992) and Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors, 786 F.2d 1400, 1408 (9th Cir.1986). The doctrine "bars a culpable plaintiff from prevailing on an action for the infringement of the misused copyright." *Id.*; quoting *Lasercomb*, 911 F.2d at 972. Misuse occurs when the copyright holder uses or "attempt[s] to use its copyright in a manner adverse to the public policy embodied in copyright law … ." *Lasercomb*, 911 F.2d at 978; citing *Berlenbach v. Anderson & Thompson Ski Co.*, 329 F.2d 782, 784-85 (9th Cir.), *cert. denied*, 379 U.S. 830, 85 S.Ct. 60, 13 L.Ed.2d 39 (1964); *see also DSC Communications*, 81 F.3d at 601, quoting *Lasercomb, supra*, at 977 (the misuse defense "forbids the use of copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office and which is contrary to public policy to grant").  Notably:

> The grant to the [author] of the special privilege of a [copyright] carries out a public policy adopted by the Constitution and laws of the United States, 'to promote the Progress of Science and useful Arts, by securing for limited Times to [Authors] … the exclusive Right …' to their ['original' works].   United States Constitution, Art. I, §8, cl. 8, [17 U.S.C.A. §102].   But the public policy which includes [original works]

> within the granted monopoly ***excludes from it all that is not embraced in the [original expression].***

*Lasercomb, supra,* at 977 (emphasis added); quoting *Morton Salt Co. v. G.S. Suppiger*, 314 U.S. 488, 492, 62 S.Ct. 402, 405, 86 L.Ed. 363 (1942); *see also Alcatel*, 166 F.3d at 792-93, quoting *Lasercomb, supra,* at 976 (whereas 'copyright law [seeks] to increase the store of human knowledge and arts by rewarding … authors with the exclusive rights to their works for a limited time … the granted monopoly power does not extend to property not covered by the … copyright").

Courts have denied copyright owners the right to enforce their copyright on grounds of copyright misuse based on licensing, litigation, and other tactics of the copyright owner. For example, the Ninth Circuit reversed a preliminary injunction that blocked publication of a medical coding system by a would-be infringer on grounds that the copyright owner had licensed the work to a government agency under terms that prohibited use of a competing coding system. *Practice Management Information Corp. v. American Medical Ass'n*, 121 F.3d 516, 521 (9th Cir. 1997). The terms of the license effectively established the copyrighted system as law and gave the copyright owner "a substantial and unfair advantage over its competitors." *Id*. In finding misuse, the court focused on the limiting effects of the license on the licensee's rights to decide to use competing works:

> What offends the copyright misuse doctrine is not HCFA's decision to use the AMA's coding system exclusively, but the limitation imposed by the AMA licensing agreement on HCFA's rights to decide whether or not to use other forms as well. Conditioning the license on HCFA's promise not to use competitors' products constituted a misuse of the copyright by the AMA.

*Id.* Importantly, the court explained that "[w]e agree with the Fourth Circuit that a defendant in a copyright infringement suit need not prove an antitrust violation to prevail on a copyright misuse defense." Id.; *citing Lasercomb*, 911 F.2d at 978.

At least one court has found allegations about the nature of the copyright owner's use of the legal system to provide a plausible basis for copyright misuse. *See Harrington v. 360 ABQ, LLC*, 2022 WL 1567094, *3 (D.N.Mex., May 18, 2022). In refusing to strike an affirmative defense of copyright misuse, the District of New Mexico noted that the accused infringer had alleged that the copyright owner did more than merely threaten lawsuits. *Id*. The court explained that the accused infringer alleged a pattern of misuse by the copyright owner, including allowing publication of the subject photographs online without copyright notice, use of a service to track unauthorized downloads of the photographs, and abusive litigation tactics and threats that included settlement demands well in excess of the damages. *Id*. "In other words, [the accused infringer] alleges that [the copyright owner] is not using the copyright and legal system for an authorized purpose…but as a method to derive income from infringement demands or suits." *Id*. Taken as true, the court reasoned, "[t]hese allegations…state a plausible claim that [the copyright owner] has a wrongful motive and misused the copyright or legal system." *Id*.; citing *Oppenheimer v. ACL LLC*, 504 F.Supp.3d 503, 511-12 (W.D.N.C. 2020) (finding plausible claim of copyright misuse where 'a reasonable jury could find Plaintiff is using copyrights to derive an income from infringement suits'); *Malibu Media, LLC v. Miller*, 2014 WL 2619558, *5 (D.Colo. June 12, 2014); *Malibu Media, LLC v. Cuddy*, 2015 WL 1280783, *9 (D.Colo. Mar. 18, 2015).

## ARGUMENT

The record is plain that PFP derives almost all of its income from settlements of lawsuits and threatened lawsuits.  Moreover, the amounts PFP extracts in these settlements are not tied to the value of any allegedly copyrighted works; but are instead derived from PFP obtaining default judgments which PFP has in turn cited as justification for its exorbitant settlement demands.  PFP then uses the cost of litigation as a way to coerce its demand recipients to pay an amount that exceeds the value of any image in the image library to avoid or resolve litigation.  The limited monopoly protections granted by a copyright do not extend to PFP's opportunistic and opaque leveraging of default judgment awards and fear of litigation to recover amounts that far exceed the value of any copyrights it may validly hold.[85]

According to PFP, Stock food photography has been steadily losing value for decades, essentially bottoming out in 2016-17 when PFP purportedly pulled all its images from third-party vendor sites, sought for the first time and secured copyright registrations, and began filing infringement actions[86].  PFP registered copyrights in the images, nearly all of which were taken in the 1990s and early 2000s, in a set of group registration filings, each of which contained up to 250 images, between 2016 and 2017.[87]  When PFP registered the copyrights to these images, it did so with the specific intent of filing infringement lawsuits.  By shifting to a "subscription model" at the same time, the claimed value of even a single image in PFP's library went from as little as $1 to as much as $12,000 overnight.  PFP then pursued a strategy of obtaining default judgments

---

[85]     Again, Defendants do not concede that PFP has established valid ownership of any copyrights at issue herein.

[86]     Exh. 5 (Douglas Fleurant Depo, P. 46, L. 21-24, P. 47, L. 1-2, P. 162, L. 2-24).

[87]     Exh. 4 (PFP009307-9314).

wherever possible and arguing in those pleadings that its new subscription model represented fair market value as a basis for damage awards.

As detailed above, PFP's arguments in favor of its subscription model as fair market value are not supported by evidence or the facts in the record. PFP cannot identify a single subscriber that has ever voluntarily entered into a subscription agreement without first being threatened with litigation. Courts rendering default judgments in PFP's favor were left to rely on PFP's representations as to the subscription price, and the result was that PFP obtained default awards in excess of the value of the image library for reasons not actually supported by evidence or facts. PFP then hitched its litigation business to the default judgments wagon, using the awards in those default cases as PFP's basis for new exorbitant demands made upon additional targets and using the default award amounts to suggest to potential litigants that the threat of being made subject to a similar award justified paying an inflated amount in settlement to avoid protracted and costly litigation. Through litigation, PFP has already generated far more than its image library was ever worth.

The use of the legal system and the costs attendant with the litigation process to inflate the value of a copyright extends far past the rights bestowed upon a copyright holder under copyright law and constitutes a misuse of copyright that precludes enforcement of the copyright. *See Harrington*, 2022 WL 1567094 at *3 (copyright misuse includes "demanding settlements well in excess of the damages); citing *Home Design Servs., Inc. v. B & B Custom Homes, LLC*, 2008 WL 2302662, *4 (D.Colo. May 30, 2008); *see also*, *Oppenheimer*, 2022 WL 2704875 at *10 ("'a reasonable jury could find plaintiff is using copyrights to derive an income from infringement suits'" … "the evidence in this case … shows Plaintiff derives a large majority of his income from

copyright litigation"); *Home Design Servs., Inc. v. Park Square Enters., Inc.*, 2005 WL 1027370, *12 (M.D.Fla. 2005) (copyright holder may not "use its limited rights to 'obtain property protection … that copyright law clearly does not confer' in an effort to 'force a settlement or … even achieve an outright victory over' Defendants").

Taken as a whole, PFP's business tactics constitute a copyright enforcement scheme that is completely divorced from the policy purpose of the copyright law. PFP uses the threat of litigation, and actual litigation, to force its targets to purchase subscriptions to its image library. PFP demands settlement amounts that greatly exceed the value of its copyrighted works and, in turn, uses the existence of these forced subscriptions to perpetuate the myth that its monthly subscription fee and minimum term reflects an actual market price for its service. Further, considering its excessive price, the subscription PFP forces onto its victims amounts to an onerous license that limits the rights of its new customers to decide to use competing works. Taken together, these tactics amount to copyright misuse that should be punished, not rewarded.

PFP should not be permitted to continue this misuse and its claims against Defendants in this matter should be dismissed as unenforceable.

## CONCLUSION

For the foregoing reasons, Defendants submit that they are entitled to summary judgment against all claims made by PFP in the captioned matter on grounds that PFP has misused any copyrights it may validly hold such that it should properly be precluded from enforcing any such copyrights in this matter.  The facts and testimony in the record, both in this and the other matters cited herein, establish that PFP's business model is built entirely on litigation and is completely divorced from the value of any allegedly copyrighted images.  Indeed, PFP's model depends on a

knowing, continued, and self-perpetuating abuse of the legal system that enables PFP to demand from actual and potential litigants settlement amounts that exceed the value of any copyrights held and which impermissibly extend the reach of any copyright at issue past the permissible boundaries established by copyright law. Through these efforts, PFP has used the asserted copyrights in a manner that is adverse to the public policy embodied in copyright law and, as a result, in a way that constitutes copyright misuse.

Respectfully submitted,

*/s/ Alex P. Tilling*

**GEORGE D. FAGAN, T.A. (#14260)**
**ALEX P. TILLING (#29686)**
**KAREN E. FUTCH (#31164)**
**Leake Andersson LLP**
1100 Poydras, Suite 1700
New Orleans, Louisiana 70163-1701
Tel:  504-585-7500 / Fax:  504-585-7775
Email: *gfagan@leakeandersson.com*
          *atilling@leakeandersson.com*
          *kfutch@leakeandersson.com*

***Attorneys for Defendant, Epic***
***Solutions, LLC and Grocer Defendants***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing pleading has been delivered to all counsel of record on **February 28, 2025**, by ECF filing, by hand delivery, by telephonic facsimile transmission, or by depositing a copy of same in the United States Mail, first class postage prepaid, at their last known addresses of record.

*s/ Alex P. Tilling*

_____

ALEX P. TILLING