UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| Prepared Food Photos, Inc., *plaintiff,* versus Epic Solutions, LLC, ET AL., *defendants.* | No. 3:22-cv-37-TAD-KDM Judge Terry A. Doughty Magistrate Judge Kayla D. McClusky |

## DECLARATION AND CERTIFICATION OF JOEL ALBRIZIO

I, Joel Albrizio, declare and certify as follows:

1. I am the 100% owner of Prepared Food Photos, Inc. ("Plaintiff" or "PFP"), a W-2 employee of the company, and currently serve as its Treasurer and a Board member, and was previously the President. I submit this declaration in opposition to Defendants' Motion for Summary Judgment of Copyright Misuse.

2. PFP is the Plaintiff in this lawsuit against Defendants Epic Solutions, LLC ("Epic") and several of its customers, including Adrien's Supermarket, Inc. ("Adrien's"), McDaniel Food Management, Inc., McLawrence Foods, L.L.C., McDaniel Foods of Alexandria, Inc., McDaniel Foods of Drew, LLC, McLawrence Foods of Swartz, Inc., McLawrence Foods of Oak Grove, Inc., McLawrence Foods of Columbia, LLC, McLawrence Foods of W. Monroe, LLC, (collectively, the "Mac Defendants"), Piggly Wiggly South Opelousas, LLC, ("Piggly Wiggly"), and Sullivan's Grocery LA#2 Inc., Sullivan's Inc Grocery, ("the Sullivan's Defendants") (collectively, the "Grocer Defendants,") (together with Epic, the "Defendants"). This declaration is based on my personal knowledge and my knowledge of PFP's business and its records.

1

3.      I have been employed by PFP as a W-2 employee since 1992, and became its sole owner in 2011.  In 2021, Plaintiff formally changed its corporate name from "Adlife Marketing & Communications Co., Inc." to "Prepared Food Photos, Inc."  Consequently, after our name change, PFP was thus considered under the copyright act to be the original author and owner of each of the photographs at issue in this case, which were all created by two of PFP's W-2 employees, including myself and another W-2 employee.

4.      Defendants' motion on copyright misuse completely misrepresents PFP's business and its litigation history.  While I do not try to correct every falsehood in their papers, I address only their most egregious misstatements below.

5.      When we were doing business as Adlife, we also created and produced ads, primarily for grocery circulars.  When we changed the name of the company, we also split off the ad-creation and distribution business into a separate company, which I also own 100% of, currently called Bad-Adz, Inc.

6.      In the 1990s, there was a huge demand for color photos of prepared food and other non-branded food items.  Color photography first started being used in circulars and advertising in the early to mid-1990s, when Gannett revolutionized the newspaper business by introducing 4-color photography in its publication USA Today.  From that point on, we received thousands of requests from clients to shoot various food items for their circulars and advertising, and demand was especially heavy during the period from 1994 to 1997.  It was during that time that I shot most of the photographs at issue in this case and we began to establish our library.  Our library grew to tens of thousands of images, which we narrowed down to approximately 18,000 for licensing in the 2016-2017 time frame.  It cost us millions of dollars and years of hard work to build our photography library.

7. I also take issue with any claim in Defendants' papers that question whether I shot any of the photographs at issue in this case. Specifically, as I have testified elsewhere in this proceeding, I know I personally shot 39 of the 40 images at issue, and that the final one was significantly edited in 2007 from a photograph originally taken by another W-2 employee. References to hearsay affidavits from other cases, the Internet, or testimony concerning the entirety of the 18,000-photograph library, did not involve or have anything to do with any of the photographs currently at issue in this case. Do I have a perfect memory of every photoshoot I did in the 1990's some thirty years later? Of course not, but I can recognize my own work and distinguish it from others.

8. It is also false to say that our companies do not create new photographs. Because PFP is no longer itself in the ad-creation business, there is no demand for new photographs in the PFP library. Often, however, in our Bad-Adz business, clients will ask us to shoot new photos of specific items. In those cases, we do create new photographs and we do offer exclusivity to those clients, so we do not add the photographs to the PFP library for licensing, although we may do so someday. For example, we have created over 400 recipe videos in connection with our ad-creation business Bad-Adz, at significant expense to that business. We will soon make those videos, and screen shots from them of individual food items, available to any PFP licensee.

9. Currently, after spinning off the ad-creation business, PFP is in the business of licensing photographs that were authored by PFP's employees in the ordinary course of business and in protecting its intellectual property.

10. We did not create our website preparedfoodphotos.com in order to ensnare or entrap anyone into committing copyright infringement. To the contrary, we created it to replace a limited number of other licensing agencies who we terminated our relationships with towards the end of

3

2016. We had been licensing our works through one of those agencies since 1994 (Multi-Ad) and the other one starting in about 2007 (iStock).

11. It was not our intent in 2016 to be in the business of filing copyright infringement cases, but rather to supplement our income from the creation of advertisements (now done through Bad-Adz) with licensing revenue.

12. However, what soon became apparent in 2017 was that parties who had obtained time-limited licenses through Multi-Ad were continuing to use our photographs despite notice from Multi-Ad and its successor in interest that the licenses to use our photographs had been terminated. In addition, many entities seemed to have found our photographs from other sources (such as by right-clicking on other grocers' authorized ads), and were using them without our permission. When we would write to these entities to ask them to stop and pay a licensing fee, they sometimes settled, but often refused to respond at all, which resulted in us having to file suit to prevent them from continuing to infringe.

13. Accordingly, the reason we have filed a large number of lawsuits relating to our photo library is not to entrap anyone. It is because infringing uses devalue our licensing program. In addition, we promise our licensees (and customers of Bad-Adz) that we will not permit uses of the same photographs in the same geographic areas as their stores, and we need to root out infringing uses from the marketplace so we can honor that promise.

14. In their brief, Defendants assert that we issued "perpetual" licenses through multiple agencies prior to creating our licensing program, and that we did not keep track of who the agencies were licensing the works to through their programs. That is misleading and false.

15. Before terminating the Multi-Ad and iStock agreements in 2016, we made every effort not to license images through those parties that we were using for customer ads. We also

made every effort not to license the same images though both Multi-Ad and iStock. Thus, because we were not independently licensing the images, there was no reason to track the identities of the licensees for the purpose of avoiding marketplace duplication.

16. In fact, Multi-Ad did advise us, upon request, who they were licensing our photographs to – and although it turns out that Multi-Ad actually provided us with false or incomplete information about their licensees (for example, it left Epic off the list), that does not mean that we did not try to keep track of who was using our photographs when we started licensing our library on our own in 2016. In addition, our agreement with Multi-Ad required that it only issue time-limited licenses, not perpetual licenses. Over time, we provided about 5,200 of our photographs to Multi-Ad for licensing on this limited basis. But during that time, we tried not to use those same photographs in ads for customers of our ad-creation business, so that we could honor our promise not to use the same photographs for customers in the same geographic area. It is our understanding that Epic received the photographs at issue in this case from Multi-Ad, and not from any other source.

17. Our agreement with iStock, which was later acquired by Getty Images, did have different terms, but we only licensed approximately 4,460 photographs through iStock. iStock has confirmed they never issued a license to any of the Defendants in this case for any of our photographs. While iStock did offer its customers perpetual licenses, the number of photographs we allowed iStock to license was extremely limited (many of those images were never licensed at all by any of iStock's customers), and we did not use those for other customers when we created ads. Thus, we did not make any promise to customers that they would have exclusive use in their regions for photos that were licensed through iStock.

18.    Accordingly, the Defendants' citation to various excerpts of testimony and briefs concerning our promise of geographic exclusivity to our customers is cited by Defendants completely out of context. When we talk about that, we are talking about our post-2016 direct licensing efforts and our pre- and post-2016 business that creates ads. It has nothing to do with our licensing programs from 1994 to 2016 through either Multi-Ad or iStock.

19.    We did not, prior to 2016, offer licenses through any other agency aside from Mutli-Ad and iStock. In addition, when we send cease & desist letters to parties we do not know, we do often inquire as to whether they received a license and ask for a copy of any such license, so as to try to avoid filing suit against a party that was licensed.

20.    Before 2005 our business primarily involved the use of our photographs in print. The technology available required PFP to send a potential licensee the original film, or a duplicate thereof, so they could in fact duplicate the image. With today's technology, it is possible to easily copy and paste an image. Therefore, it was not necessary to register the copyright in our images until well into the 2000's in order to protect the images. Further, it was not until around the time that we terminated the iStock and Multi-Ad arrangements that we learned that copyrights were more valuable and could only be enforced if they were registered with the copyright office. That is why the registrations in this case all date from 2016-2017. There was nothing malevolent about the timing of the registrations.

21.    Since we started noticing a large number of infringements in 2017, in part caused by existing ad-creation customers complaining that competitors were using the same images, and in order to understand the scope of the unauthorized usage, we have employed a small team of in-house researchers who, in order to protect our intellectual property, work to uncover unauthorized uses of photographs via the Internet so that we can protect our existing licensees and customers.

While we had a physical office until 2024, when the lease came up for renewal, we decided we no longer needed it because after the Covid pandemic, people primarily just wanted to work from home. I had also moved from Rhode Island to Florida. Many companies (both small and large) post-pandemic have exited or consolidated their physical premises – there is nothing nefarious about no longer having a physical office. The licensing business does not require it. And, we have moved about a dozen of PFP's former employees from PFP to Bad-Adz, many of whom have been long time employees. The people who work from home do so in part because our clients are in multiple time zones around the United States, allowing our employees to work more flexible hours while maintaining work/life balance.

22.    Defendants' argument about our staff is also false. We currently have five employees, not two as claimed in Defendants' papers. I am still a PFP employee and I am a photographer, although less active than I was three decades ago in the 1990s. Thus it is false to say that PFP does not employ any photographers. To the extent we needed to prepare cooked foods in the creation of the library, we had a studio and a kitchen and we often cooked the food ourselves, brought in food from outside, or shot in restaurants where we knew the chefs. Again, there is nothing untoward about not having any employees who are chefs now.

23.    PFP typically does not bring suit against a party it has not first contacted in an effort to resolve an infringement. While some of the settlements and judgments we have received have been large, we do not consider them to be larger than the value of the photographs. Each case turns on its specific facts, such as the time and length of infringement, the scope of infringement (both the number of photos and types and breadth of distribution), the type of company and size of the infringer, and other factors. We take all of those factors into account in arriving at negotiated settlements. Defendants' statements that none of our licenses or settlements were made at arms-

7

length are completely false. Indeed, why would anyone pay more than the photographs are worth? That would not make any economic sense. No one has been coerced to sign a license agreement with us or settle an infringement claim (whether pre-litigation or in a lawsuit). Similarly, we have not tried to deceive any party or any court about the size of any default judgments we have obtained against intransigent infringers. All of the cases we have cited in letters or briefs are easily discoverable from the public record.

24. PFP's licenses do not require that its licensees maintain any form of exclusivity with PFP, such as prohibiting other vendors from creating the licensee's ads using our photographs, prohibiting licensees from using other providers of licensed photographic libraries, prohibiting licensees from using photographs from any third-party, or prohibiting licensees from using other photographers.

Pursuant to 28 U.S.C. § 1746, I make this declaration under penalty of perjury, and certify that the foregoing facts are true and correct to the best of my knowledge.

Executed on March 24, 2025.

                                                             */s/ Joel Albrizio*
                                                             Joel Albrizio